SUFFIELD DEVELOPMENT ASSOCIATES LIMITED PARTNERSHIP *v.* NATIONAL LOAN INVESTORS, L.P., ET AL.
(SC 16586)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued February 15—officially released July 9, 2002

Richard P. Weinstein, with whom was Nathan A. Schatz, for the appellant (plaintiff).

Kerry R. Callahan, with whom, on the brief, was Karen K. Clark, for the appellees (defendant Berman and Sable et al.).

Opinion

ZARELLA, J. The plaintiff, Suffield Development Associates Limited Partnership, appeals from the judgment of the Appellate Court affirming the trial court's judgment in favor of the defendants, National Loan Investors, L.P. (National), the law firm of Berman and Sable, and attorney James W. Oliver.[1] *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 64 Conn. App. 192, 194, 779 A.2d 822 (2001). The trial court rendered judgment for the defendants granting the defendants' motions to strike the plaintiff's original and amended complaints.[2] The complaint and amended complaint were based on the defendants' alleged fraud and misrepresentation when obtaining an execution that the plaintiff alleges was for an amount in excess of the amount due under a stipulated judgment between the parties. The amended complaint alleged: (1) abuse of process; (2) fraudulent

---

[1] While this case was pending in the Appellate Court, the plaintiff withdrew its appeal against National Loan Investors, L.P. The remaining defendants are Berman and Sable and Oliver. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 64 Conn. App. 192, 194 n.1, 779 A.2d 822 (2001). Unless otherwise specified, references to the defendants are to National, to the law firm of Berman and Sable, and to Oliver.

[2] After the court granted the defendants' motions to strike all four counts of the plaintiff's original complaint, the plaintiff filed a timely amended complaint that preserved its appellate rights with regard to the first and second counts and alleged additional facts relating to the third and fourth counts. See Practice Book § 10-44.

misrepresentation; (3) tortious interference with a settlement agreement between the plaintiff and a third party; and (4) a violation of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; and sought common-law punitive and exemplary damages, punitive damages under CUTPA and attorney's fees. We reverse the judgment of the Appellate Court with regard to the first count and affirm the judgment with regard to the other counts.

This litigation arises from a previous dispute between the plaintiff and National (National litigation). In the National litigation, National was represented by Oliver and the law firm of Berman and Sable. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 64 Conn. App. 195. The National litigation was resolved by a stipulated judgment between the parties that contained a provision that the judgment could "be satisfied only by proceeds from a certain Lender Liability Judgment in favor of [the plaintiff] . . . ."

The term "certain Lender Liability Judgment" in the stipulated judgment referred to a judgment that the plaintiff previously had obtained against Society for Savings and its successor bank, BankBoston, as a result of a damages action instituted by the plaintiff (Society for Savings litigation). At the time that the stipulated judgment containing this term was entered in the National litigation, the judgment that the plaintiff had obtained in the Society for Savings litigation was on appeal. The Society for Savings judgment was vacated on appeal and a new trial was ordered. See *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 846, 708 A.2d 1361 (1988). Prior to the new trial, the plaintiff settled the Society for Savings litigation with BankBoston for $1.5 million. *Suffield Development Associates Ltd. Partnership* v.

*National Loan Investors, L.P.*, supra, 64 Conn. App. 195–96.

Essentially, under the stipulated judgment in the National litigation, National could recover from the plaintiff only out of funds that the plaintiff recovered from BankBoston in the Society for Savings litigation. The stipulated judgment entitled National to 15 percent of the amount recovered by the plaintiff in the Society for Savings litigation if that amount exceeded $1,333,333.33.

After the plaintiff and BankBoston agreed to settle the Society for Savings litigation for $1.5 million, the plaintiff notified the defendants in the present action of the settlement. The plaintiff stated that it did not believe it had any duty under the stipulated judgment and offered to place in escrow some of the funds received from the settlement. The plaintiff then instituted an action seeking a declaratory judgment that it did not have a duty to pay a portion of the $1.5 million settlement to National. Id., 196 n.3; see *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 60 Conn. App. 842, 844–46, 763 A.2d 1049 (2000). The plaintiff alleged that the phrase "certain Lender Liability Judgment" applied to the first award in the Society for Savings litigation, which had been vacated, and not to the eventual $1.5 million settlement. Essentially, the plaintiff alleged that because it had not recovered any money under the original judgment against Society for Savings, it owed no money to National in the National litigation.[3]

---

[3] In the action for the declaratory judgment, the trial court eventually determined that the defendants were entitled to $200,000 of the settlement proceeds that the plaintiff received from BankBoston. Both parties appealed and the Appellate Court affirmed the judgment of the trial court. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 60 Conn. App. 844–46.

In response, the defendants applied to the trial court for an execution in the National litigation to seize $375,000 of settlement funds received by the plaintiff from BankBoston. The trial court granted the application, and the defendants directed a sheriff to carry out the execution.

The plaintiff then instituted the present action alleging that: (1) the defendants' execution overstated the amount due them under the stipulated judgment between the parties and was an abuse of process; (2) the defendants committed fraud on the court by misrepresenting the amount owed them under the stipulated judgment; (3) the defendants' execution on the settlement proceeds constituted tortious interference with the contractual relationship between the plaintiff and BankBoston; (4) the defendants were engaged in the conduct of trade or commerce and their actions were immoral, oppressive, unethical and unscrupulous, and therefore violated CUTPA. After the trial court granted the defendants' motions to strike the amended complaint, the plaintiff appealed to the Appellate Court. The Appellate Court affirmed the judgment of the trial court; *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 64 Conn. App. 195; and the plaintiff petitioned this court for certification to appeal. We granted the plaintiff's petition for certification to appeal, limited to the following question: "Did the Appellate Court properly conclude that the plaintiff had not sufficiently alleged facts constituting causes of action for: (1) abuse of process; (2) fraudulent misrepresentation; or (3) violation of [CUTPA]?" *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 258 Conn. 922, 782 A.2d 1252 (2001).

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of

the court's ruling is plenary. *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997). We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996); see also *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108–109, 491 A.2d 368 (1985). Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. *Waters* v. *Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996)." (Internal quotation marks omitted.) *Jewish Home for the Elderly of Fairfield County, Inc.* v. *Cantore*, 257 Conn. 531, 537–38, 778 A.2d 93 (2001).

I

## ABUSE OF PROCESS

Turning to the plaintiff's first claim, we conclude that the plaintiff has alleged facts sufficient to support a claim of abuse of process. Therefore, the defendants' motion to strike should have been denied as to count one of the amended complaint.

"An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed. *Varga* v. *Pareles*, [137 Conn. 663, 667, 81 A.2d 112 (1951)]; *Schaefer* v. *O. K. Tool Co.*, 110 Conn. 528, 532–33, 148 A. 330 (1930). Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement Second (1977) of Torts, § 682, emphasizes that the gravamen of the action for abuse of process is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed . . . . Comment b to § 682 explains

that the addition of primarily is meant to exclude liability when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. See also 1 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 4.9; R. Mallen & V. Levit, Legal Malpractice (2d Ed. 1981) § 61; W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 121." (Emphasis in original; internal quotation marks omitted.) *Mozzochi* v. *Beck*, 204 Conn. 490, 494, 529 A.2d 171 (1987).

Because the gravamen of the action for abuse of process is the use of "a legal process . . . against another primarily to accomplish a purpose for which it is not designed"; 3 Restatement (Second), Torts § 682 (1977); we first must examine the purpose for which the process at issue in this case, namely an execution against debts due from a bank, is designed. Our statutes provide various mechanisms for a party with a judgment in its favor to recover money from an adversary that is unwilling to pay voluntarily. See General Statutes § 52-350f ("money judgment may be enforced, by execution or by foreclosure of a real property lien, to the amount of the money judgment"); Black's Law Dictionary (7th Ed. 1999) (defining execution as "judicial enforcement of a money judgment"). The defendants in the present case specifically availed themselves of General Statutes § 52-367a,[4] which provides a mechanism for a party to obtain an execution against, and

---

[4] General Statutes § 52-367a provides in relevant part: "Execution may be granted pursuant to this section against any debts due from any banking institution to a judgment debtor which is not a natural person. . . . If any such banking institution upon which such execution is served and upon which such demand is made is indebted to the judgment debtor, it shall pay to such officer, in the manner and at the time hereinafter described, the amount of such indebtedness not exceeding the amount due on such execution, to be received and applied on such execution by such officer. Such banking institution shall act upon such execution according to section 42a-4-303 before its midnight deadline, as defined in section 42a-4-104. . . ."

execute on, money held in a bank by the debtor. Essentially, the purpose of an execution is to provide a means for a party to recover under a judgment for money damages, the liability for, and amount of which, has been specifically determined by a court.

The plaintiff and National had entered into a stipulated judgment under which the plaintiff was to pay $375,000 to National. That recovery, however, was to be paid only after application of a specified formula to funds recovered by the plaintiff in separate litigation with a third party. Application of the formula could reduce the actual recovery by National to less than $375,000, depending on the amount recovered by the plaintiff.

Against this background, the plaintiff made the following allegations in its amended complaint. The plaintiff alleged that the defendants: (1) wrongfully applied for the execution to pressure the plaintiff into paying under the stipulated judgment in the National litigation even though the defendants were aware that the plaintiff believed no money was due under the agreement; and (2) misrepresented their right as a matter of law to, and inflated the amount of, the execution. The plaintiff alleged, therefore, that the defendants used the process of an execution to pressure the plaintiff into paying money to National and to recover money that the plaintiff did not owe under the stipulated judgment.

The defendants offer two reasons why the plaintiff's complaint failed to allege facts sufficient to support a claim of abuse of process; neither is convincing. First, the defendants point out that in the amended complaint the plaintiff did not contest the validity of the stipulated judgment in the National litigation. The complaint alleged only that the stipulated judgment did not apply to the plaintiff's eventual settlement with BankBoston. The defendants argue that, because an execution is

designed to enforce a valid money judgment, a claim for abuse of process simply does not arise where an execution was obtained pursuant to a valid stipulated judgment. In other words, the defendants assert, although there may be some dispute surrounding the sum of money subject to the execution, the execution itself was used in a manner consistent with its design and purpose.

This argument is unpersuasive. The plaintiff's amended complaint supports a claim for abuse of process because it alleged that the defendants had misrepresented the amount to which National was entitled as a matter of law under the stipulated judgment, inflated the amount owed, and thereby obtained an excessive execution all for the purpose of coercing the plaintiff into making payment to National. We conclude that such allegations may give rise to a claim for abuse of process because executions are properly obtained and used only in accordance with a valid judgment and in an appropriate amount.

Second, the defendants argue that, at worst, the plaintiff has alleged only a difference of opinion between the parties, whereas the plaintiff's position was that no money was owed under the stipulated judgment or less money was owed than the amount for which the defendants obtained the execution.[5] This argument is also unpersuasive because an execution is to be used to enforce payment of a valid and specific court judgment. See General Statutes § 52-350f ("money judgment may

---

[5] The defendants also claim that the plaintiff owed them $225,000 under the stipulated judgment plus interest and costs, which they argue "was likely to equal" $375,000. Not only does this argument reach the underlying facts of the case, which are not part of our consideration of a motion to strike, but the time during which interest would have accrued was approximately one month. Interest would have accrued only from April, 1999, when Bank-Boston and the plaintiff settled their dispute, to May, 1999, when the defendants filed for the execution. On this basis, the defendants' claim that interest and costs would be "likely to equal" $150,000 is not reasonable.

be enforced, by execution or by foreclosure of a real property lien, to the amount of the money judgment"); Black's Law Dictionary, supra (definition of execution). The plaintiff alleged that the defendants used the execution to pressure the plaintiff in an extortionate manner and to recover money the amount of which was still in dispute. Obtaining an execution is not a mechanism designed to pressure a party into settlement in other litigation, to determine how much one party owes another, or to secure money pending the outcome of litigation. To use it for any of those purposes potentially constitutes an abuse of process.

Although there are few cases on this subject, both sides rely on *Mozzochi* v. *Beck*, supra, 204 Conn. 490. We believe that our decision in *Mozzochi* supports the plaintiff's claim in the present case and that the defendants' reliance on it is misplaced. In *Mozzochi*, the plaintiff alleged that the defendant attorneys pursued litigation after discovering that the action was baseless. Id., 491. We concluded that an attorney's duty not to pursue groundless litigation "does not give rise to a third party action for abuse of process unless the third party can point to specific misconduct intended to cause specific injury outside of the normal contemplation of private litigation." Id., 497. The complaint at issue in *Mozzochi*, we concluded, did not state a cause of action for abuse of process because it did not allege a specific instance where a procedural tool was used for some purpose other than the one for which it was designed. Id. As examples of actions that might give rise to claims for abuse of process, however, we listed, "unreasonable force, excessive attachments or extortionate methods . . . ." Id., 493. The excessive execution alleged in the present case is similar to the excessive attachment discussed in *Mozzochi* because, if it is assumed that an improper purpose was alleged in each case, both the execution here and the attachment

there constitute the use of process to recover or secure an amount of money greater than the amount determined to be owed or, in the case of excessive attachment, greater than the amount necessary to provide security pending the outcome of litigation.

The defendants' reliance on *Mozzochi* is misplaced for two reasons. First, unlike the plaintiff in *Mozzochi*, the plaintiff in the present case alleged a specific instance of misconduct with an ulterior motive as a basis of its claim for abuse of process. Second, the misconduct alleged in the present case fits easily into the category of actions that we stated in *Mozzochi* might have constituted abuse of process had they been alleged.

## II

## FRAUDULENT MISREPRESENTATION

The plaintiff acknowledges that its amended complaint does not allege facts sufficient to support a claim for either common-law fraud or fraud on the court. Instead, the plaintiff invites us to recognize a new fraud tort based on the circumstances of this case. We decline the invitation.

Because the new tort proposed by the plaintiff is based on traditional fraud claims, we first discuss the various types of fraud claims. "The essential elements of an action in common law fraud, as we have repeatedly held, are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 539, 661 A.2d 530 (1995). Under a fraud claim of this type, the party to whom the false representation was made claims to have relied on that representation

and to have suffered harm as a result of the reliance. The plaintiff's claim in the present case satisfied two of the elements of common-law fraud by alleging that the defendants made a false representation and that the plaintiff was harmed by the representation. The plaintiff concedes that it failed to satisfy the other two elements because the allegedly false representation was not made to the plaintiff and the plaintiff did not act in reliance on the representation. The plaintiff, therefore, has not alleged facts sufficient to support a claim for common-law fraud.

In the present case, the basis on which the defendants were trying to recover was a stipulated judgment between the parties. Although we have recognized, in the context of marital dissolutions, that fraud may arise when one party accepts a stipulation based on a fraudulent representation by the other party; see *Billington* v. *Billington*, 220 Conn. 212, 217–18, 595 A.2d 1377 (1991); the only remedy available to the defrauded party in such a situation, however, is to have the court open and reconsider the judgment as a matter of equity. "A marital judgment based upon a stipulation may be opened if the stipulation, and thus the judgment, was obtained by fraud." Id.; see *Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d 837 (1980). A court will open a marital judgment secured by fraud if: (1) there was no laches or unreasonable delay by the injured party after the fraud was discovered; (2) there is clear proof of the perjury or fraud; and (3) there is a substantial likelihood that the result of the new trial will be different. See *Billington* v. *Billington*, supra, 218. The plaintiff in the present case acknowledges that no judgment was obtained by fraud. Moreover, the plaintiff in the present case seeks damages for the alleged fraud by the defendants, not equitable reconsideration of a court ruling or judgment. The plaintiff's allegations do

not support a claim for fraud even when analogized to similar situations in the marital dissolution context.

The plaintiff uses the term "fraud on the court" to describe the cause of action it alleges against the defendants in this case, but the allegations and the remedy sought are inconsistent with the situations to which that term traditionally is applied. First, in the context of marital dissolution, the concept of fraud on the court is "confined to situations where both parties join to conceal material information from the court." *Billington* v. *Billington*, supra, 220 Conn. 225. That is not the situation in the present case. Second, in all contexts, when one party has made fraudulent representations to a court, or caused a court to be misled in some way, it could be said generally that the party has committed fraud on the court. See *Davis* v. *Fracasso*, 59 Conn. App. 291, 298, 756 A.2d 325 (2000) (defendant claimed plaintiff committed fraud on court by inflating amount of income lost after motor vehicle accident). The statutory remedy for fraud on the court is that the Superior Court may grant a new trial for "reasonable cause"; General Statutes § 52-270 (a);[6] which includes "every cause for which a court of equity could grant a new trial, such as, for example, fraud, accident and mistake." (Internal quotation marks omitted.) *Jenkins* v. *Bishop Apartments, Inc.*, 144 Conn. 389, 391, 132 A.2d 573 (1957). Yet, the plaintiff in the present case frames its allegations as a tort claim and seeks damages rather than an equitable review of the execution allegedly obtained by fraud. Neither of these concepts of fraud on the court supports the plaintiff's amended complaint.

Unable to allege facts to support any of the traditional claims for fraud or fraud on the court, the plaintiff in

---

[6] General Statutes § 52-270 (a) provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for . . . the discovery of new evidence . . . or for other reasonable cause . . . ."

effect urges us to amalgamate the two into a new tort. The plaintiff asserts that the defendants made a fraudulent misrepresentation, not to the plaintiff but to the trial court, which induced the trial court to act to the plaintiff's detriment, and that the plaintiff should be allowed to recover damages on the basis of the defendants' fraud on the court. The plaintiff does not, however, propose any specific elements for the new tort, nor does the plaintiff offer even a single legal principle or public policy argument supporting its creation. Compare *Mendillo* v. *Board of Education*, 246 Conn. 456, 717 A.2d 1177 (1998) (plaintiffs urged adoption of cause of action for loss of parental consortium and, with amicus curiae, offered several arguments in favor: child has suffered grievous loss, parental consortium is analogous to spousal consortium, public policy is to promote welfare of family, interest of child is not to be dislocated from parent, parent-child relationship has constitutional significance). The plaintiff asserts only that, "there is no good reason why the defendants' misrepresentations to the court in order to obtain the execution should not also give rise to a claim for damages . . . ." We are unwilling to create a new common-law cause of action on that basis.

## III

## CUTPA

The plaintiff's final claim is that the Appellate Court improperly concluded that the plaintiff failed to allege sufficient facts in its amended complaint to support a claim that the defendant attorney and law firm violated CUTPA by obtaining the execution at issue in this case.[7] The plaintiff alleges that the defendants engaged in an unfair and deceptive practice when they obtained an

[7] General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

execution in excess of the amount provided in the stipulated judgment between the parties.

"This court has stated that, in general, CUTPA applies to the conduct of attorneys. *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 521, 461 A.2d 938 (1983). The statute's regulation of the conduct of any trade or commerce does not totally exclude all conduct of the profession of law. . . . Id. Nevertheless, we have declined to hold that every provision of CUTPA permits regulation of every aspect of the practice of law . . . . Id., 520. We have stated, instead, that, only the entrepreneurial aspects of the practice of law are covered by CUTPA. *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997). Accordingly, as in the health care context, we conclude that professional negligence—that is, malpractice—does not fall under CUTPA. Id." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79, 717 A.2d 724 (1998).

Our CUTPA cases illustrate that the most significant question in considering a CUTPA claim against an attorney is whether the allegedly improper conduct is part of the attorney's professional representation of a client or is part of the entrepreneurial aspect of practicing law. Applying this distinction to the present case, we conclude that the plaintiff failed to allege sufficient facts to support a CUTPA claim against the defendant attorney and law firm.

The plaintiff's amended complaint alleges that the defendants engaged in an unfair and deceptive trade practice by obtaining an execution in excess of the amount their client was owed under a stipulated judgment. Although that may be actionable professional misconduct, we conclude that these allegations do not support a CUTPA claim because obtaining an execution on a judgment relates to the representation by the defen-

dant attorney and law firm of their client and not to the entrepreneurial aspect of practicing law. Obtaining an execution to collect on a court judgment is the heart of an attorney's representation of a client because it is a means by which the attorney secures actual compensation for the judgment obtained by the client.

The plaintiff attempts to draw a distinction between the present case and the cases previously set forth by emphasizing that the amended complaint in the present case alleges intentional misconduct. In support of this distinction, the plaintiff relies on *Dudrow* v. *Ernst & Young*, Superior Court, Docket No. X01CV 980144211 (September 14, 1999), in which the trial court reasoned that "intentional misconduct . . . [must] constitute an entrepreneurial trade practice since it would constitute a stark departure from the standards understood to be embodied in the work of professional services . . . ." We are unpersuaded by this reasoning. First, it is important to note that, although all lawyers are subject to CUTPA, most of the practice of law is not. The "entrepreneurial" exception is just that, a specific exception from CUTPA immunity for a well-defined set of activities—advertising and bill collection, for example. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34–38, 699 A.2d 964 (1997) (reasoning that practice of law and medicine may give rise to CUTPA claims only for entrepreneurial aspects, such as solicitation of business and billing, and not for claims involving issues of competence and strategy). It is not a catch-all provision intended to subject any arguably improper attorney conduct to CUTPA liability. Therefore, the mere fact that the actions of the attorney and the law firm might have deviated from the standards of their profession does not necessarily make the actions entrepreneurial in nature.

Second, the plaintiff suggests that when an attorney intends to profit from intentional misconduct, the misconduct then becomes entrepreneurial. Although this

logic may seem compelling when applied to fraud, it is not helpful, but indeed it is confusing, when used to categorize other aspects of the practice of law. Many decisions made by attorneys eventually involve personal profit as a factor, but are not considered part of the entrepreneurial aspect of practicing law. The commentary to rule 1.7 of the Rules of Professional Conduct implicitly recognizes that fact by stating that consideration of a lawyer's interests should not be permitted to have an adverse effect on the representation of a client. For example, taking on a new client or discontinuing representation of a current one, settling a case, pursuing an appeal, or hiring expensive experts are all decisions that may be made in the best interest of the client, and still, because the attorney's and client's interests are often aligned together, also properly may be in the attorney's financial interest as long as such actions do not have an adverse effect on the interests of the client. The attorney's financial considerations do not place all of these actions into the category of entrepreneurial aspects of practicing law. Using an attorney's financial considerations as a screening mechanism for separating professional actions from entrepreneurial ones would dissolve the distinction between the two, subjecting attorneys to CUTPA claims for any decision in which profit conceivably could have been a factor. Accordingly, we reject such an interpretation.

Finally, our justification for exempting negligent malpractice from CUTPA claims—that liability would have a chilling effect on lawyers' duty of robust representation—applies equally to intentional misconduct. "Providing a private cause of action under CUTPA to a supposedly aggrieved party for the actions of his or her opponent's attorney would stand the attorney-client relationship on its head and would compromise an attorney's duty of undivided loyalty to his or her client and thwart the exercise of the attorney's independent

professional judgment on his or her client's behalf." *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 727, 627 A.2d 374 (1993). It is of no consequence that the plaintiff in the present case is alleging intentional misconduct. By shielding attorneys from CUTPA liability for professional conduct, we do not intend to protect intentional malpractice, just as we never have intended to protect negligent malpractice. Rather, protecting professional conduct from CUTPA liability ensures that no attorney is discouraged from intentional and aggressive actions, believed to be in the interest of a client, by fear of being held liable under CUTPA in the event that the action is later deemed to have been an intentional deviation from the standards of professional conduct. "[W]e must . . . take care not to adopt rules which will have a chilling and inhibitory effect on would-be litigants of justiciable issues. . . . [We seek] to avoid any rule that would interfere with the attorney's primary duty of robust representation of the interests of his or her client." (Citation omitted; internal quotation marks omitted.) Id., 728. Accordingly, we conclude that the defendants' motion to strike the plaintiff's CUTPA claim was properly granted.

The judgment of the Appellate Court is reversed as to count one of the plaintiff's complaint alleging abuse of process and the case is remanded to that court with direction to remand it to the trial court with direction to deny the motion to strike as to that count and for further proceedings according to law; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.