[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Michael Fishman, ("Fishman"), has brought this action against his former employer, SmarServ Online, Inc. ("SmartServ") claiming breach of his employment contract resulting in his constructive discharge, breach of the implied covenant of good faith and fair dealing and violation of the Connecticut wage statute.[1]
A. The SmartServ Business
The court makes the following findings of fact by a preponderance of the evidence.
In 1997, SmartServ was a start-up venture that had several software and computer systems that were in various stages of development. The SmartServ products included SmartServ Pro, which provided real time stock quotes and news, TradeNet, a more sophisticated product that allowed for real time quotes and online equity trading and BrokerNet, which was designed to allow brokers in small satellite offices to have on-line access to account information of their clients. In order to sell these products to institutional customers, as opposed to individual investors, enhancements to the products were being developed by the company during 1997.
SmartServ also had a product, Smartphone, which displayed information such as stock quotes, news and weather over a phone. This service was being marketed in conjunction with Sprint. In addition, SmartServ had an Interactive Voice Response product called IVR, marketed to both individuals and institutions.
Finally, SmartServ was developing a product called NighTrade jointly with the brokerage firm of Schroeder Co. NighTrade appeared to be potentially the most promising product because it was going to be one of the first products of its kind to allow individual investors to trade in CT Page 2066 "after hours" security markets. However, the ability to market NighTrade pursuant to the joint venture was subject to Schroder Co. receiving a "no action" letter from the Securities and Exchange Commission concerning the product's use in securities trading.
Throughout Fishman's employment at SmartServ, defendant, Sebastian Cassetta ("Cassetta"), was SmartServ's Chairman and Chief Executive Officer. Defendant, Steven Francesco ("Francesco"), was SmartServ's President and Chief Operating Officer when Fishman began working for SmartServ. Defendant, Claudio Guazzoni ("Guazzoni"), was a principal of the Zannett Securities Corporation. In September 1997, defendant Zannett Securities Corporation, invested $4 million in SmartServ. Under the terms of that financing, all SmartServ expenditures over $2000 had to be approved by Zannett. In January 1998, Guazzoni took a seat on SmartServ's Board of Directors.
B. Fishman's Negotiations With SmartServ
Prior to joining SmartServ, Fishman was employed in a sales capacity by a competitor of SmartServ's in the online financial information industry. Fishman had worked in the financial data services industry for four years and was familiar with the products available and the customers in the market. Fishman's base salary at PC Quote was $50,000 per annum and he earned commissions of approximately $200,000 during the first eleven months of 1997.
Fishman had initial discussions about potential employment with SmartServ with Francesco and Cassetta at a Securities Industry Association show in June 1997. Over the course of the next four and one-half months, Fishman and his colleague from PC Quote, Jonathan Paschkes, had numerous discussions and engaged in extensive negotiations with SmartServ concerning potential employment. During this period, Fishman reviewed information about the Company including Securities and Exchange Commission filings, media releases and other materials.
The SEC filings showed that SmartServ was experiencing significant net losses and contained numerous cautionary statements highlighting the risks involved in SmartServ. The June 30, 1997 Form 10-KSB, for example, noted (i) that the Company only had sufficient funds on hand to fund operations until April 1998; (ii) that no assurance could be made that it could generate sufficient cash flow from operations to offer its services on an economically sound basis; (iii) that the Company had never been in the financial position to pay dividends; (iv) that there were no assurances that it would ever be in the position to pay dividends; and (v) that there was a "going concern" qualification from its auditors. In CT Page 2067 addition, Fishman did his own due diligence which included meeting with management, the engineers and programmers and viewing demonstrations of the products.
During the negotiations, Cassetta discussed with Fishman that while NightTrade was an exciting product it was subject to SEC approval. Prior to signing the agreement, Francesco also told Fishman that there had been slippage in finishing the enhancements needed for the products to sell to institutional customers and because of an internal management struggle that Francesco did not believe that he would last with the company until the end of the year. Accordingly, when Fishman signed the agreement he was aware that the products did not have the enhancements necessary to sell to institutional clients and that the company was having serious management problems.[2] Fishman also recognized when he entered into the agreement that this was a "high risk high reward proposition" and that in his mind he had "two years in which to do it."
Prior to entering into the agreement, Fishman represented to SmartServ that he had the ability to attract lucrative contracts, that he was a large producer for PC Quote, that he had contacts and customers at many Wall Street firms including Merrill Lynch, Goldman Sachs, All Tech, Momentum Securities, Cornerstone Securities and others, that he would be able to bring accounts from PC Quote to SmartServ and that he could bring in revenues. Fishman also represented to SmartServ during the negotiation period that he was responsible for 2-3 million dollars in revenues at PC Quote and he could guarantee revenues to SmartServ once he was hired.
C. Fishman's Employment Contract
In July 1997, SmartServ made an initial employment offer to Fishman. Fishman was represented by counsel during the ongoing negotiations. After exchanging five drafts, Fishman signed an agreement on October 21, 1997.
Fishman's contract covered the period from December 1, 1997 to December 1, 1999 and called for him to perform the following duties:
 Executive shall be employed as Vice President of Sales and shall perform such duties as the President or Chairman may from time to time prescribe which shall include, without limitation, developing new sales opportunities, providing sales support materials, preparing and writing sales proposals and financial analysis for launching new projects, . . . and aiding in strategic planning . . . Executive shall devote his full time to perform the services required of him hereunder . . . Executive shall render the services required of him hereunder faithfully and exclusively . . . as shall be reasonably required by CT Page 2068 President or Chairman and shall use his best efforts, judgment, skill and energy to improve and advance the business and interests of the Company in a manner consistent with the duties of his position.
Accordingly, Fishman agreed that he would perform the duties assigned to him by the Chairman. Among those duties he was to develop new sales opportunities, prepare and write sales proposals and financial analyses for launching new projects and aid in strategic planning for the Company. Fishman was not hired just to sell existing products of SmartServ.
With regard to compensation, the contract called for a base salary of $65,000 per year, and contained the following provisions concerning sign-on bonus stock options, incentive stock options for new business and an override bonus based on sales generated by the Company.
 (i) Sign On Bonus — grant on the date of execution of this Agreement of an incentive stock option to purchase 160,000 shares of common stock with an option price equal to the fair market value of the common stock at the date of grant determined under the 1996 Stock Option Plan of SmartServ Online, Inc. (the "Plan"). The option(s) will vest and Executive will be able to exercise the options 50% on or after October 21, 1998 and 50% on or after October 21, 1999. The terms of the option will in all events be subject to the terms and conditions of the [1996 Stock Option] Plan maintained by the Company.
 (ii) Incentive Stock Options For New Business — Executive shall be entitled to additional incentive stock options based upon the Company's billing of $1 million of sales on an annualized basis ($83,333 per month) from all Company sales. For each $1 million in annualized sales ($83,333 per month), the Company shall grant an option to purchase 100,000 shares of common stock with an option price equal to the fair market value of the common stock at the date of grant as determined under the Company's stock option Plan. At the end of each quarter, options will be granted and vested equal to the proportionate amount of sales in relation to the $1 million of sales on an annualized basis ($83,333 per month). Such bonus calculation shall be exclusive of all sales generated by the Sprint direct marketing initiatives.
 (iii) Override Bonus — A monthly override bonus shall be paid to Executive in an amount equal to 2% of all sales generated by Company on a monthly basis above the monthly billings as of the date of the commencement of Employment under this Agreement in accordance with Section 2. Such bonus calculation shall be exclusive of all sales generated by the Sprint direct marketing initiatives.
CT Page 2069
There is no clause in the signed agreement that addresses what, if anything, Fishman would receive in the event that SmartServ sold or spun off part or all of its business. There is also no anti-dilution clause in his agreement. Finally, Fishman admitted at trial that no representations were made in the agreement regarding the financial situation of the company, the level of sales or the status of enhancements to the products.
After signing his contract, Fishman attended a Board of Directors meeting on October 30, 1997, where he was introduced to members of the Board. At that meeting, Fishman expressed a great deal of enthusiasm over the NighTrade product which he believed could potentially be the Company's lead product. He was reminded by Guazzoni that he had to focus on existing products and that current revenues were as important as the long term benefits that they hoped to derive from NighTrade.
D. SmartServ's Management and Financial Problems
Fishman commenced employment at the Company on December 1, 1997. The management conflict between Cassetta and Guazzoni, on the one side, and Francesco on the other was immediately apparent at a meeting the first day. The rift focused on the extent of Guazzoni's involvement in company affairs and the relative priorities that should be given to allocating resources regarding the Company's products. As Francesco had predicted to Fishman, he ceased performing services for SmartServ on December 10, 1997.
During the period from December 1997 through March 1998, the Company was in need of cash, which impacted its ability to enhance its products. While Francesco had believed in July of 1997 that the products would be enhanced by mid-January, he told Fishman they were delayed before Fishman signed his employment agreement. The enhancements were actually completed at the end of February 1998.
In late February 1998, NASDAQ informed SmartServ that it was on the verge of being delisted as a publicly traded company because of its poor financial condition. The situation was further exacerbated when Schroder Co. the joint venture partner charged with obtaining regulatory approval for the NighTrade product, announced that it was abandoning its attempts to obtain SEC approval for NighTrade.
E. The DTN Deal and the Move to Wireless
Based on the financial condition of the company, Cassetta began CT Page 2070 contacting a number of firms in December 1997 to seek alliances with businesses that could either work with SmartServ, buy its products or use its products. This led to discussions with Data Transmission Network ("DTN") representatives in January 1998 about the possibility of working together. Cassetta told Fishman in January 1998 that SmartServ was entering into discussions with DTN to license certain of its products.
The DTN alliance potentially provided SmartServ with significant revenue and an established salesforce and customer base. Fishman admits that he believed it was a good idea to go forward with the DTN transaction. Cassetta along with Mario Rossi ("Rossi"), the Director of Operations, negotiated the deal with DTN. Fishman did not participate in the negotiations or the drafting of the agreements. His involvement in the DTN negotiations was limited to attending the initial meeting at SmartServ with DTN, participating in internal meetings with senior management concerning the transaction, receiving certain financial information at the request of senior management, locating exchange agreements and introducing Mr. Stokes of DTN to a SmartServ customer.
On March 3, 1998, SmartServ entered into a non-binding letter of intent with DTN to exclusively license three of SmartServ's products and to purchase certain SmartServ assets. The letter specifically stated that it did not create any legal binding obligations on DTN or SmartServ. Fishman admitted at trial that he knew the letter of intent was not binding. Negotiations ensued over the next seven weeks and the proposed effective date of April 2, 1998 had to be deferred because negotiations were ongoing. The negotiation of the escrow agreement and other terms continued after April 10, 1998 which was Fishman's last day of employment. On April 23, 1998, SmartServ and DTN finally entered into an Asset Purchase Agreement and Software License and Service Agreement.
Under the Asset Purchase Agreement, SmartServ sold three client servers, the trade names TradeNet and BrokerNet and its contracts with customers (i.e., subscriber base) for $850,000. The Software License and Service Agreement granted DTN the exclusive right to market and sell the SmartServ Pro, TradeNet and BrokerNet products in exchange for SmartServ receiving a monthly license and maintenance fee based on the percentage of revenues received each month by DTN. Accordingly, the DTN agreement involved the sale of hardware, software and intellectual property, the future provision of maintenance services, and the licensing of certain products for sale. The first revenues from DTN were received by SmartServ on May 1, 1998. Specifically, on May 1, 1998, DTN transferred $924,991.00 to SmartServ.
F. SmartServ's and Fishman's Post-DTN Deal Prospects
CT Page 2071
While the DTN negotiations were ongoing, Cassetta told Fishman that he wanted him to stay, but that if Fishman was interested in moving to DTN, SmartServ would release him from his contract. While Fishman was told by SmartServ that he could explore a job opportunity with DTN, he was never told that unless he accepted such a job, he would be terminated. In fact, Fishman admits that he was never told by anyone at SmartServ that his job was in jeopardy. He also testified that he never felt that his job was in jeopardy if he did not take a position with DTN.
While SmartServ had exclusively licensed three of its main products to DTN, the Company also had its Smartphone and Interactive Voice Response products. In late March 1998, SmartServ was also examining creating products using wireless technology and Fishman testified credibly that he felt that Cassetta had wanted him to be part of the Company's move to wireless technology. In this regard, Fishman authored two reports in early March and early April 2002 regarding potential opportunities in this area. The Company later did shift to wireless technology and upon Fishman's resignation immediately began a search for his replacement. A new director of sales was hired within 6-9 months to perform Fishman's duties.
In mid-March, Fishman also prepared an extensive Sales and Marketing Plan for SmartServ. This report made clear that there were sales and marketing opportunities for Fishman to fulfill after the DTN transaction had he chosen to remain at SmartServ. Finally, DTN and SmartServ entered into an informal arrangement under which they were jointly selling products.
G. Fishman's Attempts to Leave SmartServ
Beginning shortly after Fishman started at SmartServ he sought to have the Company "buy out" his contract. In January, he again tried to arrange for a buyout or substantial modification of his contract. Management told Fishman it would not consider a buyout.
On March 9, 1998, less than a week after the DTN letter of intent was announced, Fishman sent an e-mail to Cassetta, Rossi and Haller, requesting that he be provided the paperwork on his sign-on bonus stock options as well as that he be given the starting sales figures as of his first day of employment.
His letter also stated that he had been aware of the Company's sales and that he was owed his monthly override for December 1997, January 1998 and February 1998 as well as his quarterly incentive stock options for CT Page 2072 December 1997.
In addition, Fishman sent a memo to Cassetta, Guazzoni, Rossi and Haller dated April 2, 1998, listing these same grievances and adding that he was now concerned with indications from management that it would not grant him new business options and a monthly override bonus on the "DTN deal."
Fishman also expressed in his April 2, 1998 letter concern that the Company's plan to increase its number of authorized shares from 15 million to 40 million would substantially dilute his equity position. In order to allay his concerns, the letter stated, he wanted the payments, acknowledgments and information requested by no later than April 9, 1998.
Haller was responsible for responding to the March 9 and April 2 requests by Fishman. He testified credibly that he did not do so because he was busy with closing the books, SEC reporting, preparing for the annual shareholders meeting, amending the stock option plan, handling an NASD delisting threat and attending to personal family health issues.
Prior to his resignation, Fishman was never told by Cassetta, Guazzoni or Francesco that he would not be compensated on the DTN deal. Cassetta did tell Fishman that he would not be compensated on certain aspects of the deal but that they would work something out after the deal was finalized.
With regard to the sign-on bonus options, Fishman's options were not scheduled to begin vesting until late October 1998. Specifically, the agreement provided that options will vest and first become exercisable 50% on or after October 21, 1998 and 50% on or after October 21, 1999. Fishman was told at the time he negotiated his contract that Board authorization or shareholder approval was required to issue the paperwork for his options. He was also told to be patient as the options were to be re-priced at a lower price more beneficial to the employees. SmartServ's preliminary proxy materials filed with the SEC on March 6, 1998 and the proxy materials sent to shareholders on April 3, 1998 listed Fishman as being granted 160,000 options.
Under the Agreement, Fishman's monthly sales override bonus and new business options were each calculated using the November 1997 sales (less Sprint sales) as a benchmark. Fishman's monthly sales override bonus was two percent of the amount by which monthly sales (less Sprint sales) exceeded the November 1997 sales (less Sprint sales). CT Page 2073
Fishman's new business incentive stock options were calculated on a quarterly basis predicated on SmartServ realizing (after deducting Sprint sales) $1,000,000 in sales on an annualized basis ($83,333 per month) in excess of the November 1997 benchmark.
SmartServ's monthly sales figures (less Sprint sales) for Fishman's four months of employment were (1) lower in December than they had been in November, (ii) for January, less than $8,000 above the November benchmark; (iii) for February 1998, less than $24,000 above the November benchmark and (iv) for March 1999, less that $38,000 above the November benchmark.
Because the December 1997 sales figures fell below the November 1997 benchmark amount, Fishman had no claim to override commissions for December sales or new business options for the fourth quarter.
Although the first quarter sales figures did exceed the November 1997 benchmark in January, February and March, they fell far short of $1,000,000 on an annualized basis necessary to be awarded new business options. Thus, based on the Company's sales figures (which were not finalized until May), the only incentive compensation that Fishman was eligible to receive was the override bonus for the individual months of January, February and March of 1998. The reason Fishman did not receive these commission checks prior to his resignation was because Haller had not closed out the books on the first quarter's sales.
H. Fishman's Resignation From SmartServ
In March and April of 1998, Cassetta sent two memoranda to Fishman regarding his job duties. Cassetta was frustrated with sales revenues being generated by Fishman, and his arriving late to work. He did not want to terminate Fishman as he felt that he had a lot of potential and possibly just needed to be managed better. On March 11, 1998, Cassetta sent Fishman a memorandum criticizing him for failing to prepare a weekly sales report since he joined the company despite being asked to do so. Cassetta instructed him to have a report of his sales efforts within ten days. He also instructed Fishman that, on those days when he did not have meetings in Manhattan, he was expected to come to the Stamford Office. He further noted that a staff meeting was held every Monday at 8:00 a.m. and required that Fishman maintain the same work hours as other executives of 8:00 to 8:30 a.m. until at least 6:00 p.m. Subsequently, on April 9, 1998, Cassetta instructed Fishman to send him a copy of his weekly activity report and to maintain a log of his activities.
The following day, Fishman resigned, claiming he had been CT Page 2074 constructively discharged. Fishman had engaged counsel by mid-March to advise him concerning SmartServ. Counsel reviewed and assisted Fishman in preparing his April 2 and April 10 submissions to the Company. His April 10, 1998 letter addressed to Cassetta, Guazzoni, Rossi and Haller stated in pertinent part:
 On March 9, 1998 and April 2, 1998, I delivered letters to you requesting certain information and the payment of overdue wages/commissions. You have failed to respond to either one of my letters and I still have not been paid all sums due me for my work. These failures are a clear violation of our employment agreement and constitute constructive discharge.
 I therefore tender this notice of involuntary separation. Based on SmartServ's conduct, I consider my employment with SmartServ Online to have ceased, effective immediately.
Upon Fishman's resignation, no one at SmartServe ever consented to his resignation. Under the stock option plan any unvested options granted terminated immediately upon Fishman's resignation.
On April 24, 1998, Haller sent Fishman a check for his final pay period. Fishman received all salary earned by him from the period December 1, 1997 to April 10, 1998. In addition, upon Haller's closing of the books for the quarter in mid-May, SmartServ sent Fishman a check in the amount of $931.19 (the net amount of $1,372.41 less withholdings) for the monthly override payment for the first quarter of 1998.
Fishman received all bonus overrides and incentive stock options for new business to which he was entitled under the agreement.
 I. Fishman's New Job
In mid-May 1998, approximately one month after resigning from SmartServ, Fishman began working for Townsend Analytics, Ltd.
Fishman's employer testified that Fishman contacted her about a job about a month or two before he started at Townsend. She said there was a delay in Fishman's showing up to work at Townsend because there was some business Fishman needed to finish up at SmartServ, which she later learned was a business deal with a "data vendor." Fishman admitted that he may have told Townsend that he had to finish a deal before he left. Based on this testimony, the court finds that Fishman was in the very least in discussions with Townsend before he resigned on April 10, 1998, and more likely had already been extended and accepted an offer. CT Page 2075
At Townsend, Fishman's starting base salary was $120,000 per year and, with bonus he earned more than $120,000 during 1998, even though he was employed for less than eight months. Subsequently, he received gross wages in excess of $240,000 for 1999 and $340,000 for 2000.
 DISCUSSION OF LAW
Plaintiff's claims in this matter proceed under three theories: (1) that SmartServ's actions constituted a material breach of the agreement which excused any further performance on his part and constituted a constructive discharge; (2) that SmartServ breached its implied contractual duty of good faith and fair dealing under the agreement; and (3) that SmartServ and the individual defendants violated Conn. General Statutes § 31-72 by failing to pay wages that were due. Plaintiff has failed to satisfy his burden of establishing any of his claims.
A. SmartServ Is Entitled to Judgment on Plaintiff's First Count for Breach of Written Employment Agreement
To prevail on a claim for breach of contract a party must establish: (1) the existence of a contract; (2) a breach of the contract; (3) and damages. Chem-Tek, Inc. v. General Motors Corp. , 816 F. Sup. 123, 131
(D.Conn. 1993). "A party cannot recover on a contract unless he has fully performed his obligations under it, has tendered performance or has some legal excuse for not performing." Ravitch v. Stollman Poultry Fams,Inc., 165 Conn. 135, 149, 328 A.2d 711, 719 (1973). Under the law, a performance will be excused only if there is a material breach of the contract. See Bernstein v. Nemeyer, 213 Conn. 665, 672, 570 A.2d 164, 168
(1990).
"Contract law has always distinguished between `material' and `immaterial' breaches. If a breach is immaterial, the existing rights of the parties do not change. The contract remains enforceable although the breach may occasion liability for damages, if any can be proved . . . a material breach, on the other hand, does affect the substantive rights of the parties. A substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract . . ." A. Prete Son Const. v. Madison,1994 WL 570243, at *15 (Conn.Super.Ct. Oct. 4, 1994) (quoting Aldape v.Lubcke, 107 Idaho 316, 688 P.2d 1221, 1232 (Idaho App. 1974). The standard of materiality [of contractual breach] must be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performance." 699 Atlantic Street Associates. Atlantic-Rockland StamfordCT Page 2076Associates, 43 Conn. App. 113, 128, 682 A.2d 672 (1996). A material as opposed to incidental breach of contract is one that is "so important that it vitiates or destroys the entire purpose for entering into the contract." A. Prete Son Const. v. Madison, 1994 WL 570243, at *15.
In analyzing the materiality of a breach, Connecticut courts have looked to the multi-factor standards in the Restatement (Second) of Contracts § 241 (1981). Bernstein v. Nemeyer, 213 Conn. 665, 672,570 A.2d 164 (1990). These standards are: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." A. Prete Son Constr., 1994 WL 570243, at *15, Bernstein, 213 Conn. 665,570 A.2d 164. See also Carlyle Johnson Machine Co., LLC v. April,2000 WL 234311 (Conn.Super.Ct. Feb. 10, 2000) (no material breach in delay in paying and failing to pay a portion of the billings when company paid 82% of billings and was attempting to perform contract and when breach would result in its loss of its intellectual and property rights in product that it had invested heavily in); Van Dyck Printing Co. v. DiNicola,43 Conn. Sup. 191, 648 A.2d 898 (Conn.Super. 1993) (no material breach when late payment of commissions was not material or waived), aff'd.,231 Conn. 272, 648 A.2d 877 (1994).
In the present matter, Fishman resigned from employment on April 10, 1998. He argues that he can sue for breach of contract, however, because as a result of SmartServ's alleged material breach of his employment contract he was excused from any further performance on his part.[3]
Specifically, Fishman contends that the contract was materially breached because three out of five SmartServ products were licensed to another company to sell, no options purportedly granted had been documented, commissions had not been paid up until April 10, 1998, promises made during negotiations had not been kept, the company's sales and marketing strategy had changed, his equity position had been diluted, management was micro-managing his work, he had been excluded from screen phone sales, the company had tried to get him a job with DTN, and finally, because he believed he was not going to get paid on the DTN deal. The plaintiff has not satisfied his burden of showing that his contract was materially breached in any manner. Accordingly, he was not excused from further performance and not constructively discharged.[4]
CT Page 2077
Normally a material breach of employment agreement is found where there is an unjustified reduction of rank or a material change in duties. Plaintiff did not have his job title or responsibilities reduced at anytime while he was employed by SmartServ. See, e.g., Hayes v. ResourceControl, Inc., 170 Conn. 102, 365 A.2d 399 (1976) (where employee's contract provided for him to serve as vice president of marketing and sales, and expressly prohibited demotion, contract was breached when plaintiff was demoted to sales manager of nonexistent Western sales district in California). The requirements set forth in Cassetta's March 11 and April 9 memos directing Fishman to provide Cassetta with reports of his activities did not constitute a change in his work assignments or duties, much less a change in his position. Cassetta's requirement that Fishman provide him with the detail involving his sales activities and plans is supported by the express language of the agreement.
 Licensing of SmartServ Products
The DTN deal did not leave Fishman without anything to do. As an initial matter, the contract with DTN was not even finalized until approximately two weeks after he resigned. Even after the contract was signed, the Company still had the SmartPhone and Interactive Voice Response products without any restrictions on their use. Cassetta could have had Fishman start focusing his attention on these products. Further, Fishman's agreement called for the development of new products and, Fishman himself provided reports to management in March and early April concerning new opportunities. It is also significant that Cassetta immediately began looking for a new vice president of sales and hired a replacement within the next six to nine months. Additionally, there is no language in the Agreement that prevents SmartServe from licensing its products. Accordingly, because plaintiff still had job duties and opportunities and the contract did not prevent SmartServ from licensing products, the DTN contracts did not constitute a material breach of Fishman's agreement.
 The Options
Fishman claims that SmartServ failed to grant to him and document 160,000 options when the agreement was signed and that SmartServ could not immediately do so because the additional options needed to be authorized by the Board. There is no provision in the employment agreement requiring option "paperwork" to be given at any specific time and the first fifty percent of Fishman's sign-on bonus options were not scheduled to vest until a year after they were granted. On March 6, 1998, the Company filed preliminary proxy materials and sent proxy CT Page 2078 materials to shareholders for the April 24, 1998 annual meeting, at which time the increase in shares was approved. The proxy statement stated unambiguously that Fishman had been granted 160,000 options. This statement was sent out before Fishman resigned on April 10, 1998.
Fishman also conceded that he was told in mid-December 1997 and early March 1998 that all employee stock options were going to be repriced at a lower rate due to SmartServ's falling stock price which had placed the options granted to him and other employees severely "underwater."
Accordingly, the evidence demonstrates that the company recognized and was in the process of fulfilling its obligation to provide plaintiff with his options. While at best the inability of SmartServ to immediately grant the options constituted an immaterial breach, it certainly did not constitute a material breach in that plaintiff was not deprived of any benefit, the defendant was curing its failure and the defendant was acting in good faith.
 Commissions
With respect to the December 1997 override bonus, Fishman was not entitled to receive any bonus for that month. With respect to the January through March override bonus, the agreement does not provide that commissions had to be paid any sooner than they were actually paid. The "on a monthly basis" language refers to the amount of sales generated not when payment is to be made. Fishman also acknowledges that no one ever told him that he would not be paid the override bonus (or options). In fact, he resigned his employment a mere ten days after the close of the quarter and was paid all that he was due once Haller prepared the sales figures for the first quarter.
 Pre-agreement Discussions
Plaintiff's claim that promises during negotiations were not kept and that the company's strategies changed are not the basis for a breach of contract claim because there is no language in the agreement which prevented the company from changing its sales and marketing strategy. Additionally, since this is a breach of written contract action, any statements made prior to the executed agreement which did not become part of the agreement are irrelevant and cannot be the basis for a claim.
 Equity Position
Fishman's amended complaint also alleged that the Company "diluted" his equity position by increasing the number of authorized shares from 15 CT Page 2079 million to 40 million. This claim is without merit. Fishman had no contractual right to any particular equity position and cannot point to any manner in which he was harmed by the potential "dilution." In fact, no executive at SmartServ had an anti-dilution provision.
 DTN Opportunity
SmartServ's willingness to allow Fishman to pursue possible employment with DTN does not constitute a breach of contract. Fishman has testified that he did not consider the DTN overtures to be threatening when they were made, and he has testified that Cassetta never indicated to him that his job with SmartServ was in jeopardy. The fact that SmartServ gave Fishman an option to go to DTN, if DTN was willing and Fishman chose to do so, is not evidence of a breach of the agreement.
 Compensation or the DTN Transaction
Plaintiff claims that he is entitled to compensation for the DTN deal and that he was told he would not receive any compensation from this deal.
Fishman's claim that he was told that he would not be paid commissions on the DTN deal is not supported by the facts. The DTN transaction was not even completed when he resigned and Cassetta testified credibly that while he told Fishman he would not be compensated on certain aspects of the deal he also said they would work something out once the deal was closed.
The DTN deal was a complex transaction involving, among other things, licensing, provision of services, source code escrow, sale of goodwill and the sale of servers, among other things. To the extent that Fishman contends that he was entitled to options on the entire deal the language of the agreement does not support this position. The agreement does not address what was to occur in the event of the sale of part of the company or the licensing of products. Under general principles of contract construction, "[a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction . . . [t]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the CT Page 2080 ordinary meaning leaves no room for ambiguity . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." Lawson v. Whitey's Frame Shop, 241 Conn. 678, 686, 697 A.2d 113
(1997) (internal quotation marks omitted); Pensino v. Atlantic Bank ofN.Y., 244 Conn. 85, 91-92, 708 A.2d 540 (1998).
In this case, no language in the agreement addresses what, if anything, Fishman was to receive if part of the assets of the business was sold or if the products were licensed. The basic rules of construction also provide guidance to the courts where the contract is silent. Parol evidence may not be offered to vary or contradict the written terms of a integrated contract. When offered for that purpose, it is inadmissible. However, "[a] term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument." Heyman v. CVS, Inc., 178 Conn. 215, 227,423 A.2d 887, 893 (1979) (citations omitted). "The intent of the parties to a contract cannot be found by implication unless a contrary intention cannot be supposed or any other inference made." Connecticut Co. v.Bivision 425, 147 Conn. 608, 621 (1960).
In this case the court cannot read into the agreement that the parties intended that Fishman was to get compensation based on the DTN transaction. This is particularly so given Fishman's admission that he sought some "grand slam" language covering the sale of the business, spin-offs and the like. Simply stated such language does not appear in his contract. See Golden Pacific Bancorp v. FDIC, 273 F.2d 509 (2d Cir. 2001) (fact that terms suggested and rejected strongly suggests that the contract does not contain those terms).
Additionally, it is well-settled that a party cannot claim anticipatory repudiation based on indefinite statements under circumstances that do not yet exist.
 In order to constitute an anticipatory breach of contract, there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives. Doubtful and indefinite statements that the performance may or may not take place and statements that under circumstances that in fact do not yet exist, the performance will not take place, will not be held to create an immediate right of action.
4 Corbin on Contracts § 973 at 801-02 (citing Wonalacet Co. v.Banfield, 116 Conn. 582, 165 A. 785 (1933)); Wells v. Hartford M.CT Page 2081Anilla Co., 76 Conn. 27, 55 A. 599 (1903).
Moreover, because the court finds that there was no material breach of the agreement by SmartServ, plaintiff's departure on April 10, 1998 must be treated as a voluntary resignation. Seery v. Yale-New Haven Hospital,17 Conn. App. 532, 540 (1989). Because the DTN contract was not signed until April 23, 1998, which was after Fishman had voluntarily resigned from the company, and no revenues were actually received from the DTN deal until May 1, 1998 Fishman is not entitled to any compensation for the DTN transaction. This is because even if the agreement was interpreted to include revenues from the sale of assets or licensing of product under any interpretation of the agreement, plaintiff was not entitled to revenue for transactions that closed after plaintiff voluntarily resigned.
In sum, there was no material breach of the agreement by SmartServ and therefore, plaintiff voluntarily resigned from SmartServ. Plaintiff left after four months because the business had not developed as plaintiff had hoped when he signed on for this "high risk" venture. None of these events, however, constituted breaches of any obligations made by SmartServ in the agreement. Therefore, judgment is entered for the defendant on the first count.
B. SmartServ is Entitled to Judgment on Fishman's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing
Every contract imposes upon each party [to it] a duty of good faith and fair dealing in its performance and its enforcement. Warner v. Konouz,210 Conn. 150, 154 (1989).
"[A] claim for breach of the implied covenant of good faith and fair dealing is not legally sufficient unless a dishonest purpose or sinister motive is alleged." Wolverine Fire Protection Co. v. Tougher Indus.,Inc., 29 Conn.L.Rptr. 731, 2001 WL 808395, at *4 (Conn.Super.Ct. June 20, 2001) (citation and internal quotation omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . Bad faith means more than mere negligence; it involves a dishonest purpose."Habetz, 224 Conn. at 237 (citations and internal quotes omitted). A mere conclusory allegation of bad faith "unsupported by any factual allegations, is insufficient to sustain a claim of bad faith." WolverineFire Protection Co., 29 Conn.L.Rptr. 731, 2001 WL 808395, at *4 (citations and internal quotations omitted). CT Page 2082
Because SmartServ did not breach any terms of the agreement and there was no evidence presented of bad faith, SmartServ is entitled to judgment on Plaintiff's third count for breach of the implied covenant of good faith and fair dealing.
C. The Defendants Are Entitled to Judgment on Plaintiff's Claim for Unpaid Wages Under Conn. General Statutes § 31-72
Plaintiff has failed to satisfy his burden of establishing a violation of Conn. Gen. Stat. § 31-72. Fishman received everything he was entitled to under his agreement for the time he spent at SmartServ. His salary, commissions and bonus overrides were all paid in a reasonably timely manner. Plaintiff was not entitled to any additional stock options because he resigned voluntarily prior to the DTN transaction closing and before any revenues were received.
Accordingly, the Defendants are entitled to judgment on Fishman's claims for "unpaid wages" under § 31-72.
SMARTSERV'S COUNTERCLAIMS
A. Fraud
"The essential elements of an action in common law fraud . . . are that (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Suffield Dev. Assocs., LtdP'shp v. Nat'l Loan Investors, L.P., 260 Conn. 766 (202) (quoting Weismanv. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (1995)); Conn. National Bankv. Voog, 233 Conn. 352, 367, 659 A.2d 172, 179 (1995) (citation omitted).
Fishman represented that he had the ability to attract lucrative contracts, that he was a large producer for PC Quote, and that he had contacts and customers at many Wall Street firms, including Merrill Lynch, Goldman Sachs, All Tech, Momentum Securities, and Cornerstone Securities. Fishman also represented that he was responsible for $2-3 million dollars in revenue at PC Quote and that he believed he could guarantee revenues to SmartServ once he was hired. No evidence was presented that he did not produce 2-3 million dollars at PC Quote or that he did not have institutional customers. Furthermore, SmartServ was sophisticated enough to know that Fishman was a salesman and that he was going to engage in some "puffing" as to his abilities. Gold v. UniversityCT Page 2083of Bridgeport, 19 Conn. App. 379, 385 (1989). This does not constitute fraud and SmartServ has not satisfied its burden of proof as to this counterclaim.
B. Breach of Contract
Count Two of the Counterclaim alleges that Fishman breached the agreement by not using his best efforts, judgment, skill and energy to advance the interests of SmartServ. Based on the court's factual findings, defendant has not sustained its burden of proof with respect to this claim.
Accordingly, SmartServ has not satisfied its burden of proof with regard to its counterclaims and judgment is entered for Fishman on all of the counterclaims.
 CONCLUSION
For the reasons stated above, the court finds for the defendants on all of plaintiff's claims and finds in favor of plaintiff on all of defendant's counterclaims.
 CHASE T. ROGERS SUPERIOR COURT JUDGE