SUFFIELD DEVELOPMENT ASSOCIATES LIMITED
PARTNERSHIP *v.* NATIONAL LOAN
INVESTORS, L.P., ET AL.
(AC 26450)

Bishop, Rogers and Pellegrino, Js.

---

542

Argued April 17—officially released September 19, 2006

*Kerry R. Callahan,* with whom, on the brief, were *Barbara A. Frederick* and *Ffiona M. McDonough,* for the appellants-appellees (defendant Berman and Sable et al.).

*Kerry M. Wisser,* with whom, on the brief, were *Richard P. Weinstein* and *Nathan A. Schatz,* for the appellee-appellant (plaintiff).

*Opinion*

ROGERS, J. This action arose from an abuse of process in connection with the procurement, service and maintenance of an excessive execution. The defendant law firm of Berman and Sable and the defendant attorney James W. Oliver[1] appeal, and the plaintiff, Suffield Development Associates Limited Partnership, cross appeals from the judgment of the trial court awarding damages to the plaintiff. The defendants claim that the court improperly (1) found that the execution at issue was excessive, (2) concluded that the defendants had

---

[1] The defendant National Loan Investors, L.P., settled this matter with the plaintiff, Suffield Development Associates Limited Partnership, prior to trial and is not a party to these appeals. Hereinafter, we use the term "defendants" to refer to Berman and Sable and Oliver only. We note additionally that throughout the opinion, in discussing the facts and procedural history of three other, related actions, we use the terms "plaintiff" and "defendants" in reference to the parties having that status in the present action, not to the plaintiffs and defendants in the other actions discussed. Accordingly, "the plaintiff" always means Suffield Development Associates Limited Partnership, and "the defendants" always means Berman and Sable and Oliver. For clarity, all other entities and individuals, regardless of whether they were parties to any of the other actions, are referred to by name.

engaged in abuse of process and (3) awarded certain damages. In its cross appeal, the plaintiff also challenges the court's damages award. We affirm in part and reverse in part the judgment of the trial court.

The events underlying this matter extend back well over a decade and have spawned three prior appeals. The following facts and procedural history, gleaned from the reported decisions in the earlier appeals or found by the court in the present matter, are necessary to give context to the issues on appeal.

The plaintiff is an entity that was formed for the purpose of developing certain commercial property. It sought funding for the project in two phases from Society for Savings, whose successor in interest was BankBoston (bank). Although the bank supplied the initial funding as contemplated, it declined to lend further amounts, and the development project failed. The plaintiff brought a two count action against the bank for its failure to provide the secondary financing (lender liability action), alleging breach of contract and, alternatively, promissory estoppel. Following a jury trial in the lender liability action, the plaintiff was awarded $2.5 million on its breach of contract claim. The bank appealed from the judgment, which our Supreme Court reversed. The case was remanded for a new trial on the promissory estoppel claim. See generally *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 708 A.2d 1361 (1998).

The failed development project also resulted in the bank's commencing foreclosure proceedings against the plaintiff (foreclosure action).[2] During the litigation,

[2] The plaintiff's three principals, James G. Sutton, Barrett L. Krass and James J. Heneghan, and its general partner, Suffield Development Corporation, also were defendants in the foreclosure action.

National Loan Investors, L.P. (National), was substituted for the bank in the foreclosure action.[3] The defendants acted as legal counsel for National in the foreclosure action, and it is their conduct in relation to that action that gave rise to the present matter.

On December 17, 1996, while the lender liability action was on appeal, the parties to the foreclosure action agreed to a stipulated judgment. Pursuant to the stipulation in the foreclosure action, a deficiency judgment in the amount of $375,000 was rendered in favor of National. The stipulation provided further, however, that the deficiency judgment could be satisfied only from the damages award, if any, eventually received by the plaintiff in the lender liability action (lender liability judgment).[4] The plaintiff had other creditors potentially interested in the lender liability judgment. Furthermore, at the time the stipulation was reached, the ultimate amount of that judgment was uncertain. Accordingly, the stipulation established a sliding scale formula that eventually would be applied to determine the amount to which National was entitled to satisfy the deficiency judgment in the foreclosure action.

Stated simply, pursuant to that formula, if the proceeds of the lender liability judgment were to exceed $1,333,333.33, National would recover 15 percent of those proceeds in satisfaction of the deficiency judgment. If the proceeds of the lender liability judgment fell between $200,000 and $1,333,333.33, National would

---

[3] As one of the plaintiff's attorneys explained at trial, the lender liability action was brought as a separate lawsuit, rather than as a counterclaim in the foreclosure action, because the plaintiff's "loan obligation, [i.e.,] the mortgage and note, had been sold by Society for Savings to [National], and the lender liability claim . . . was being asserted against the old Society for Savings."

[4] The $375,000 deficiency judgment represented 15 percent of the damages the jury awarded to the plaintiff in the lender liability action, which was then on appeal. National's actual deficiency exceeded $1.3 million.

recover $200,000. If the proceeds of the lender liability judgment were between $1 and $200,000, National would recover all of those proceeds. Finally, if the plaintiff received no proceeds from the lender liability judgment, National would accept $1 in full satisfaction of the deficiency judgment.

Following our Supreme Court's remand of the lender liability action, a new jury trial commenced on the promissory estoppel count. On April 22, 1999, before the conclusion of that trial, the plaintiff and the bank agreed to a settlement whereby the bank would pay the plaintiff $1.5 million by May 13, 1999, in full satisfaction of the pending claim (lender liability settlement).[5]

Also on April 22, 1999, Richard P. Weinstein, the plaintiff's counsel in both the foreclosure and lender liability actions, telephoned Joel Sable, a senior partner at Berman and Sable, and informed him that the lender liability action had settled for $1.5 million. Weinstein also apprised Sable of the plaintiff's position that National, pursuant to the stipulation in the foreclosure action, was entitled to only $1. According to the plaintiff, the term "lender liability judgment," as used in the stipulation, did not encompass the lender liability *settlement*; thus, the proceeds of the lender liability judgment, as contemplated by the stipulation, were zero. Correctly predicting that National would disagree with the plaintiff's interpretation of the stipulation, Weinstein offered to put $200,000 of the lender liability settlement proceeds into escrow[6] and to immediately

---

[5] The lender liability settlement was not reduced to writing, but was put on the record in open court when the lender liability action was withdrawn.

[6] The plaintiff considered the amounts used as parameters in the stipulation's sliding scale to represent potential damages awards *net* of attorney's fees. Weinstein offered to put $200,000 in escrow because the $1.5 million settlement, reduced by attorney's fees, would fall somewhere between $200,000 and $1,333,333.33, the range that would trigger a $200,000 recovery for National under the stipulation.

file a declaratory judgment action in which the plaintiff's and National's respective rights to those proceeds could be determined by a court.

At some point between April 22 and 28, 1999, Sable relayed what Weinstein had told him to Oliver, another attorney at Berman and Sable who had served as trial counsel in the foreclosure action. Sable was unable to answer Oliver's questions regarding whether $1.5 million represented the gross or net amount of the lender liability settlement, and whether the settlement agreement involved any other type of valuable consideration. On April 29, 1999, Oliver contacted the bank's counsel and attempted, unsuccessfully, to learn further details of the lender liability settlement.[7] Oliver also suggested to the bank's counsel that he might have to protect National's rights by garnishing the settlement proceeds, which then were still held by the bank. The bank's counsel indicated to Oliver his disinclination to be involved in an interpleader action over the contested funds. The bank's counsel then called Weinstein and relayed what Oliver had told him.

Weinstein subsequently contacted Oliver and told him that Sable already had been informed about the amount of the lender liability settlement. Also on April 29, 1999, Weinstein wrote to Sable and expressed disappointment at Oliver's suggestion of a garnishment, given Weinstein's earlier offer to hold $200,000 in escrow pending a judicial determination of what National was owed pursuant to the stipulation. Thereafter, relations between Weinstein and the defendants, which previously had been cordial, deteriorated.

Over the next few days, Oliver considered how to respond to the foregoing events and, ultimately, decided

---

[7] Insofar as Oliver was not counsel to any of the parties in the lender liability action, the bank's counsel advised Oliver to speak with Weinstein about his concerns.

to seek an execution in the amount of $375,000, the full value of the deficiency judgment in the foreclosure action, to protect National's interest in the lender liability settlement proceeds. This amount did not reflect any calculation on the basis of the sliding scale outlined in the stipulation. Rather, it represented National's maximum possible entitlement under the stipulation, which would have been available only if the proceeds of the lender liability action were $2.5 million, i.e., the amount of the now vacated jury verdict.

As stated by the court, "[a]gainst this background, despite his awareness of [the plaintiff's] desire to obtain a judicial determination as to how much, if anything, it owed to National under the [stipulation], of attorney Weinstein's stated willingness, to that end, to file a declaratory judgment action to put the parties' dispute before the court for decision and to hold the contested portion of the lender liability settlement proceeds in escrow during the pendency of that action, and of his own lack of any factual basis for believing that the gross amount of the lender liability settlement exceeded $1.5 million, attorney Oliver applied to this court [on May 4, 1999] for an execution in the amount of $375,000. In support of his application, attorney Oliver represented to this court that National's 'TOTAL UNPAID DAMAGES AND COSTS' in the [foreclosure] action were $375,000, although, in light of what he then knew about the lender liability settlement, the maximum amount he could conceivably have claimed entitlement to, exclusive of interest, under [the stipulation], was 15 percent of $1.5 million, or $225,000."[8] That same day, the defendants obtained the sought execution and delivered it to a sheriff for service on the bank. Also on May

[8] By the defendants' interpretation of the stipulation, the amounts used as parameters in the sliding scale represented *gross* proceeds from any damages award in the lender liability action. Under that interpretation, National was entitled to 15 percent of the entire settlement.

4, 1999, unaware of the execution, Weinstein commenced a declaratory judgment action seeking to determine the amount of the lender liability settlement to which National was entitled.

The next day, when he learned that the execution had been served on the bank, Weinstein's partner, Kerry M. Wisser, called Oliver and left a message on his answering machine in which Wisser protested that under no reading of the stipulation was National entitled to $375,000 and, therefore, the execution was excessive. In his message and also in a letter he sent to Oliver that day, Wisser demanded release of the execution and warned that he would bring an action for abuse of process. In the letter, he reiterated that, under the terms of the stipulation, the maximum National could receive was $225,000 and, thus, the amount of the execution unquestionably was excessive. The execution was not withdrawn and over the next week, Oliver and Wisser attempted, unsuccessfully, to negotiate a mutually satisfactory solution to the problem of how National's interest in the lender liability settlement proceeds should be protected until the declaratory judgment action was resolved. To prevent the funds held by the bank from being released to National pursuant to the execution, Wisser filed a motion to open withdrawal to enforce settlement in the lender liability action. After a hearing held on May 17, 1999, the court, *Koletsky, J.,* granted the motion, ruled that the execution was improper and ineffective and ordered the bank to release the settlement proceeds to the plaintiff. National immediately filed an appeal from the court's order.

The bank requested instructions from the court regarding the applicability of any automatic stay, and National moved for a stay in the event an automatic stay was found inapplicable. The plaintiff objected to any stay and also filed a motion to hold National in

contempt for its attempts to delay turnover of the settlement funds. Despite further efforts, the attorneys could not agree on a mechanism to protect National's interest in the settlement funds while the declaratory judgment action proceeded. On May 26, 1999, in the midst of these events, the plaintiff instituted the present abuse of process action against National, Oliver and the law firm of Berman and Sable.

At a June 18, 1999 hearing scheduled to argue the matters relating to an appellate stay and the plaintiff's motion for contempt, Judge Koletsky proposed that the foreclosure action and the declaratory judgment action be consolidated with the lender liability action on the complex litigation docket. The parties agreed, and agreed further that, to avoid an expensive appeal from the court's May 17, 1999 order or an interpleader action by the bank, the entire $375,000 against which the execution had been filed would be held in an interest bearing account of the law firm of the bank's counsel. The funds would remain in that account, subject to the execution, until further order of the court. National agreed to withdraw its appeal from the May 17, 1999 order and its motion to stay. On June 25, 1999, the account was established, and the $375,000 was deposited therein.

On August 30, 1999, Judge Koletsky held a hearing on the merits of the declaratory judgment action. After hearing argument, the court ruled orally that contrary to the plaintiff's claim, the lender liability settlement funds were proceeds from the lender liability judgment, as contemplated by the stipulation in the foreclosure action, and, therefore, they were available to satisfy National's deficiency judgment. It concluded further that the numerical parameters in the sliding scale formula established in the stipulation were intended to represent amounts *net* of attorney's fees and, consequently, National was entitled to $200,000 of the settlement funds. See footnote 6. Also on August 30, 1999,

Judge Koletsky denied the plaintiff's motion to hold National in contempt.[9]

The court's oral rulings were memorialized in a memorandum of decision dated December 8, 1999. The plaintiff then appealed and National cross appealed from the judgment in the declaratory judgment action, and this court affirmed that judgment on November 28, 2000. See *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 60 Conn. App. 842, 763 A.2d 1049 (2000). In upholding the judgment, we rejected the plaintiff's claim that the court improperly concluded that the lender liability settlement funds were proceeds of the lender liability judgment, as contemplated by the stipulation. Id., 846–48. Due to an inadequate record, we declined to address National's claims that, pursuant to the stipulation, it was entitled to more than $200,000 of the settlement proceeds.[10] Id., 848–53. On December 15, 2000, the $375,000 being held in escrow by counsel for the bank was released, along with the accrued interest. Of that sum, National received $190,000, which represented the $200,000 found to be due by Judge Koletsky less $10,000 to settle the plaintiff's claim against National in the present action.[11] The plaintiff received all of the remainder, including the interest that had accumulated in the account since its inception.

---

[9] Although Judge Koletsky accepted as proved the plaintiff's claim that National was well aware that the settlement amount was $1.5 million and that there was no legitimate way $375,000 was owed to National, Judge Koletsky found that National's conduct in filing the execution did not amount to contempt.

[10] Specifically, National had argued that the court improperly applied the sliding scale formula in the stipulation to the net, and not the gross, settlement proceeds; see footnotes 6 and 8; and improperly held National responsible for the sheriff's fees resulting from the execution. *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 60 Conn. App. 848–49.

[11] In exchange for the settlement, the plaintiff also agreed not to seek further review of this court's decision in the declaratory judgment action.

Meanwhile, in the present action, the court, *Hon. Mary R. Hennessey*, judge trial referee, granted the defendants' motions to strike the plaintiff's original and amended complaints, which were based on the defendants' allegedly wrongful behavior in obtaining the $375,000 execution, and rendered judgment in favor of the defendants. The original complaint had alleged (1) abuse of process, (2) fraudulent misrepresentation, (3) tortious interference with the settlement agreement between the plaintiff and the bank and (4) a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[12] The plaintiff appealed to this court, which affirmed the judgment. See *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 64 Conn. App. 192, 779 A.2d 822 (2001), rev'd in part, 260 Conn. 766, 802 A.2d 44 (2002). Upon further appeal, our Supreme Court reversed in part this court's decision, concluding that the plaintiff had alleged facts sufficient to support a claim of abuse of process. See *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 772–77, 802 A.2d 44 (2002). The case was remanded for further proceedings on that claim alone. Id., 784.

On remand, the plaintiff repleaded, with slight modification, its abuse of process claim. In its second amended complaint dated August 30, 2002, it set forth the underlying facts and alleged that the following actions of the defendants constituted abuse of process: their wrongful application to the court for an execution to attempt to seize part of the lender liability settlement proceeds; their misrepresentations to the court that they had a legal right to the settlement proceeds and as to the amount claimed; their wrongful direction to a sheriff to execute on the lender liability settlement

---

[12] In its amended complaint, the plaintiff repleaded its claims alleging tortious interference and a violation of CUTPA.

proceeds; and their continued attempts to enforce the execution while they were aware that the application was false, the amount was inflated and National's right to it was disputed. The plaintiff claimed further that the defendants' actions were malicious and were undertaken in an attempt to pressure the plaintiff into making some payment to National, notwithstanding that the question of whether anything was due was disputed. The plaintiff sought compensatory and punitive damages.[13]

A trial to the court was held in March, 2004. In a comprehensive memorandum of decision dated February 17, 2005, the court, *Sheldon, J.*, made extensive factual findings and concluded that the defendants' execution in the amount of $375,000 was excessive and, accordingly, an abuse of process. Underlying that conclusion was a finding that pursuant to the stipulation, National was entitled to only $225,000 of the lender liability settlement funds[14] and, therefore, the defendants' execution in a greater amount was not warranted. The court awarded total compensatory damages of $25,778, an amount comprised of: $18,453 in lost interest on the portion of the execution found to be excessive; $6225 of attorney's fees the plaintiff had incurred to resist, attempt to do away with or mitigate the adverse consequences of the wrongful execution; and $1100 of business continuation expenses the plaintiff had incurred to remain a viable entity for the purpose of maintaining this action. Because the court found that the defendants had acted improperly, but not maliciously, it awarded no punitive damages. Subsequently, the court awarded an additional $17,633.70 in offer of

---

[13] The second amended complaint also clarified that National no longer was a party to the action. See footnote 1.

[14] In this regard, Judge Sheldon interpreted the stipulation differently than had Judge Koletsky, concluding that the parameters in the sliding scale represented gross and not net amounts. See footnotes 6 and 8.

judgment interest; see General Statutes § 52-192a (b); resulting in a total judgment for the plaintiff in the amount of $43,411.70.[15] This appeal followed. Additional facts and procedural history will be set forth where necessary.

## I

## THE APPEAL

### A

The defendants claim first that the court improperly found that their execution on the lender liability settlement proceeds in the amount of $375,000 was excessive. According to the defendants, the stipulated judgment in the foreclosure action provided explicit authorization for such an execution. We disagree.

Resolution of this issue requires an interpretation of the stipulated judgment in the foreclosure action. "A judgment rendered in accordance with . . . a stipulation of the parties is to be regarded and construed as a contract. . . . We review a trial court's construction of such an agreement as an issue of fact subject to the clearly erroneous standard. . . . A contract is to be construed as a whole and all relevant provisions will be considered together. . . . In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties." (Citations omitted; internal quotation marks omitted.) *Fiddelman* v. *Redmon*, 31 Conn. App. 201, 204, 623 A.2d 1064, cert. denied, 226 Conn. 915, 628 A.2d 986 (1993).

The court's conclusion that the defendants' execution was excessive flowed from its interpretation of paragraphs two, three and four of the stipulated judgment

---

[15] The court denied the defendants' motion for reargument or, in the alternative, for remittitur.

in the foreclosure action.[16] Pursuant to paragraph two, National "agreed to stipulate to the entry of a deficiency judgment against [the plaintiff] in favor of [National] in the amount of [$375,000], which judgment shall be satisfied only by proceeds from a certain Lender Liability Judgment in favor of [the plaintiff] in [the lender liability action]."

Paragraph three, which established the sliding scale formula for recovery, provided that the plaintiff, its principals "and [National] agree that the above-referenced deficiency judgment, together with statutory interest thereon, shall be satisfied only from proceeds of the Lender Liability Judgment received by [the plaintiff], as follows: a) Fifteen percent . . . of the Lender Liability Judgment, including statutory interest, if the proceeds received are equal to or exceed [$1,333,333.33]; b) [$200,000] from the Lender Liability Judgment, if the proceeds received fall between [$200,000] and [$1,333,333.33]; c) All proceeds from the Lender Liability Judgment if the proceeds received fall between [$1] and [$200,000]. In the event that the defendant receives no proceeds from the Lender Liability Judgment, [National] agrees to accept [$1] in full satisfaction of said deficiency."

Finally, paragraph four states that the plaintiff "agrees that it will not object to or oppose the efforts of [National] to secure *said deficiency judgment* by means of a garnishment or execution duly served upon [the bank]. [National] agrees that it shall take no further action to collect on said Lender Liability Judgment and further agrees that it shall have no control over the resolution or disposition of the Lender Liability Judgment." (Emphasis added.)

---

[16] None of the parties argue that any of the remaining paragraphs of the stipulation are pertinent to this claim. We have reviewed the entire document and agree that paragraphs two through four comprise the only relevant portion.

The court, in interpreting the stipulation, concluded that National's right to recover on the deficiency judgment was restricted to one of the amounts established by paragraph three, and that its recovery was allowable exclusively from the proceeds of the lender liability judgment.[17] Applying paragraph three, it found that National was entitled to recover $225,000, and, consequently, that National's right to execute, pursuant to paragraph four, was limited to that same amount. According to the court, "[b]y agreeing [in paragraph four] to the issuance of an execution to secure 'said deficiency judgment,' the parties obviously agreed to the issuance of an execution in an amount equal to that determined to be due and owing by applying the sliding scale formula in paragraph three to the proceeds of the lender liability judgment."

The defendants argue that the court improperly construed paragraph four. They claim that the phrase "said deficiency judgment" is a reference back to the $375,000 deficiency judgment specified in paragraph two and, therefore, that the stipulation explicitly permitted them to execute in the amount of $375,000, regardless of the application of paragraph three to the ultimately determined amount of the lender liability judgment. According to the defendants, paragraph four authorized them to serve, but not to collect on, an execution in the amount of their maximum possible entitlement under the stipulation, which execution would remain in place until the deficiency judgment was satisfied pursuant to paragraph three. They claim further that there is no conceivable reason for the parties to the

[17] The court rejected the defendants' argument, pursued vigorously at trial but abandoned on appeal, that paragraph three was a satisfaction clause that merely gave the plaintiff an option to satisfy for a lesser amount the $375,000 deficiency judgment established by paragraph two. According to the defendants, if the plaintiff failed to take advantage of the opportunity set forth in paragraph three, the defendants' right to recover defaulted to the full $375,000 specified in paragraph two.

stipulation to have agreed to a deficiency judgment in the amount of $375,000 other than to give National a right to execute in that amount. The plaintiff argues in response that the interpretation of the stipulation advanced by the defendants is unworkable and that it fails to take into account the purpose of an execution. We agree with the plaintiff.

To begin, we must consider the relevant portions of the stipulation together, rather than reading paragraphs two and four in isolation as the defendants suggest. See *Fiddelman* v. *Redmon,* supra, 31 Conn. App. 204. When the foregoing provisions are read in conjunction with each other, it is clear that the $375,000 "deficiency judgment" established by paragraph two is a qualified amount, ultimately subject to downward modification as provided in paragraph three. It is axiomatic that the more specific language in a contract prevails over the more general. *Wesley* v. *Schaller Subaru, Inc.,* 277 Conn. 526, 545, 893 A.2d 389 (2006). Furthermore, it is not uncommon for an agreement initially to provide broadly for something, which then is refined or limited by the provisions that follow. Cf. *Zhang* v. *Omnipoint Communications Enterprises, Inc.,* 272 Conn. 627, 639, 866 A.2d 588 (2005) (construing introductory paragraph of deed to be modified by contrary intent expressed in subsequent, more specific provisions). Accordingly, the court properly read "said deficiency judgment," as used in paragraph four, as contemplating the $375,000 deficiency judgment identified in paragraph two, but modified by the applicable subsection of paragraph three.[18]

---

[18] We find uncompelling the defendants' argument that such an interpretation renders paragraph four nugatory because an execution could apply only to a judgment in a specific amount and not to a range of potential scenarios. The obvious answer is that paragraph four did not contemplate an execution occurring until one of the potential scenarios of paragraph three came to fruition and a specific amount became due pursuant to the sliding scale formula.

We find additional support for the court's construction of the stipulation by considering the purpose of an execution and the manner in which it operates to ensure payment of a debt. As our Supreme Court explained in resolving the first appeal in this action, "the purpose of an execution is to provide a means for a party to recover under a judgment for money damages, the liability for, and amount of which, has been specifically determined by a court." *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 260 Conn. 774. It is "not a mechanism designed . . . to secure money pending the outcome of litigation." Id., 776.

In operation, "[a]n execution . . . authoriz[es] the seizure and appropriation of the property of a defendant for the satisfaction of a money judgment against him or her . . . ." (Internal quotation marks omitted.) 30 Am. Jur. 2d 84, Executions and Enforcements of Judgments § 47 (2005). Thus, pursuant to the statute authorizing the type of execution sought by the defendants, once such an execution is served on a financial institution holding funds of a judgment debtor, "the financial institution shall remove from the judgment debtor's account the amount of such indebtedness"; General Statutes § 52-367a (c); and, if the funds are not subject to another security interest, "shall immediately pay to [the] officer [who served the execution] the amount removed from the judgment debtor's account . . . ." General Statutes § 52-367a (c).

Given the foregoing law, the rationale offered by the defendants in support of their interpretation of paragraph four, i.e., that it authorized them to serve, but not to collect on, an execution in the amount of $375,000 as security for the later payment of some potentially lesser amount due under paragraph three, is not persuasive. An execution is intended precisely to collect, not to secure, money. When successfully employed, it

results in the immediate turnover of funds in the amount sought. It is not logical that the parties to the stipulation would agree that National could execute on the plaintiff's funds to the extent of $375,000 to ensure payment of, e.g., $200,000 or $225,000, because the result of such an execution, if complied with, would be the immediate seizure and transfer of $375,000, an amount far in excess of the actual amount due. A court should avoid reading a contract in a way that renders it illogical. See, e.g., *Waesche* v. *Redevelopment Agency*, 155 Conn. 44, 51, 229 A.2d 352 (1967) (declining to construe agreement in manner that "would lead to a patently absurd and inequitable result"); see also *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 80 Conn. App. 1, 12, 832 A.2d 106 (2003) ("[i]n giving meaning to the language of a contract, an appellate court presumes that the parties did not intend to create an absurd result"), rev'd on other grounds, 272 Conn. 617, 866 A.2d 582 (2005).

Finally, we are not persuaded by the defendants' argument that there is no conceivable reason for the stipulation to provide for a $375,000 deficiency judgment other than to authorize an execution in that amount. The defendants claim that, because the sum ultimately due can be ascertained solely by application of the sliding scale formula in paragraph three, there is no other purpose for specifying a particular amount in paragraph two other than to provide for an allowable execution. We can conceive, however, of a different and more convincing reason, specifically, the one that was suggested by the court when this question arose during trial.

In general, for a valid judgment to be rendered on a stipulation, the judgment must be for a particular amount.[19] Although the parties to the stipulation wanted

---

[19] To be conclusive on the parties and to terminate litigation, a judgment must be definitive and not ambiguous or uncertain; otherwise it is defective. *Garguilo* v. *Moore*, 156 Conn. 359, 242 A.2d 716 (1968). Particularly, "[a] money judgment must specify with certainty the amount for which it is

to conclude the foreclosure litigation and agreed that National's recovery would be obtained solely from a particular source, the availability or extent of that source, at the time of the parties' agreement, was uncertain.[20] Hence, while the stipulation allowed that a judgment could be rendered in a certain amount, the parties nevertheless could have contemplated fully that ultimately, the judgment could be satisfied in a lesser amount, depending on how the uncertainty was resolved. By extension, the allowable amount of an execution, which by reference corresponded to the amount of the judgment eventually owing, could be adjusted downward as events unfolded. The court reasonably concluded that such was the case here.

On the basis of the foregoing analysis, we conclude that the court's interpretation of the stipulated judgment was not clearly erroneous. Accordingly, it properly found that the defendants' execution in the amount of $375,000 was excessive.

### B

The defendants claim next that the court improperly concluded that they had engaged in abuse of process.

---

rendered, or if the amount is not stated, it must be ascertainable *from the record* or by mere mathematical computation." (Emphasis added.) 46 Am. Jur. 2d 455, Judgments § 82 (2006); see also *Jewell* v. *Jackson & Whitsitt Cotton Co.*, 331 So. 2d 623, 625 (Ala. 1976) (judgment defective when amount not discernable *"without resort to extraneous facts"* [emphasis added]); *In re Marriage of Melton*, 816 S.W.2d 232, 238 (Mo. App. 1991) ("judgment for money which does not state a sum certain and *which requires evidence beyond the record* to ascertain the amount due is void on its face" [emphasis added]); *H.E. Butt Grocery Co.* v. *Bay, Inc.*, 808 S.W.2d 678, 680 (Tex. App. 1991) ("judgment awarding an unascertainable amount cannot be final"), writ denied (September 5, 1991).

In this case, a valid judgment could not be rendered on the stipulation absent the specific deficiency judgment of paragraph two because application of the sliding scale formula would require reference to a fact extraneous to the record in the foreclosure action, namely, the still undetermined amount of the lender liability judgment.

[20] The court analogized to the circumstance of a tort action in which the parties want to resolve the litigation and agree that damages will be payable

Specifically, they argue that the plaintiff failed to prove that in pursuing the execution, they acted with the improper purpose that was alleged in the complaint as the plaintiff's theory of the case. We do not agree.[21]

"It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of [its] complaint." (Internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 490, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006). "The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." (Internal quotation marks omitted.) Id., 491.

"[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of the pleadings therefore is plenary. . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Citations omitted; internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 559–60, 864 A.2d 1 (2005).

from insurance proceeds only, but it is unclear whether the insurer will provide the necessary coverage.

[21] The defendants argue additionally that because the stipulation in the foreclosure action authorized them to seek an execution in the amount of $375,000 to secure the deficiency judgment, their doing so was not an abuse of process. Because we rejected in part I the defendants' claim that the stipulation authorized a $375,000 execution, we need not address it further here.

The court concluded that the defendants had engaged in abuse of process by improperly obtaining the execution in an excessive amount and primarily for the inappropriate purpose of securing moneys in which their clients had no known or established right or interest. According to the court, the execution was intended to prevent the lender liability settlement funds from disappearing while an active dispute about their ownership was being litigated in the declaratory judgment action. The court disagreed, however, that the defendants, by obtaining the execution, sought to coerce the plaintiff into making a payment of money not owed under a valid and specific legal judgment, or to pressure it to abandon or reach a prompt, potentially disadvantageous settlement of a contested legal issue. The defendants argue that the court improperly concluded that they had abused process on the basis of a theory not advanced by the plaintiff because the plaintiff's only claim was that the execution had an extortionate purpose. We are not convinced.

The plaintiff's second amended complaint contained a claim that the defendants had acted with an extortionate purpose, but it also included factual allegations directly corresponding to the improper purpose found by the court. Specifically, the plaintiff alleged that the defendants misrepresented to the court that they had a legal right to the lender liability settlement proceeds and further misrepresented the amount of their entitlement thereto. It also averred impropriety in the execution insofar as the defendants pursued it "notwithstanding the dispute as to whether or not any sums [we]re due and owing." Although the complaint does not explicitly allege that the defendants were attempting to secure the settlement proceeds pending the outcome of the declaratory judgment action, the theory it outlines, construed broadly and realistically, clearly encompasses such an allegation.

This is not a case in which the plaintiff alleged one cause of action and then recovered on an entirely different one. See, e.g., *Francis* v. *Hollauer*, 1 Conn. App. 693, 695–97, 475 A.2d 326 (1984) (reversing judgment establishing prescriptive easement when complaint had alleged adverse possession). Rather, the plaintiff alleged, and recovered on, a single count of abuse of process. Furthermore, the defendants do not claim that they were "prejudiced in maintaining [their] defense, surprised by the plaintiff's proof or misled by the allegations in the complaint." Id., 695. To the contrary, the record evidences a vigorous and comprehensive defense.

We conclude that the plaintiff's recovery on its abuse of process claim was consistent with the allegations of its complaint and general theory of the case. Accordingly, the court properly concluded that that claim had been proven.

C

The defendants' final claim on appeal is that the court's award of damages is unsupported by the evidence. They argue that in calculating lost interest, the court employed an improper time frame. The defendants urge further that the rates used by the court to calculate lost interest were improper. We disagree with each of these claims.

The following additional procedural history is relevant to the defendants' claims relating to damages. As part of the compensatory damages due to the plaintiff, the court awarded lost interest on $150,000, i.e., the portion of the $375,000 on which the defendants had wrongfully executed, for the 581 day period between May 13, 1999, the date by which the plaintiff was to have received the lender liability settlement proceeds from the bank had the execution not been served, and

December 15, 2000, the date the disputed funds ultimately were released from the escrow account of the bank's counsel following resolution of the declaratory judgment action. It awarded interest at an annual rate of 8 percent, the difference between 10 percent, which is the statutory rate used in Connecticut to assess loss arising from the wrongful detention of money; see General Statutes § 37-3a; and 2 percent, the average rate at which the court found interest had accumulated on the funds during the time they remained in escrow.

1

The defendants argue that in calculating lost interest, the court should have included only the interest that would have accrued between May 13 and June 25, 1999, the date on which the bank's counsel placed the $375,000 subject to the execution in an escrow account pending resolution of the declaratory judgment action. According to the defendants, when Weinstein, at the June 18, 1999 hearing before Judge Koletsky, agreed that the disputed funds could be held in the escrow account, he waived the plaintiff's right to seek damages related to the execution that accrued subsequent to that date. We are not persuaded.

"Waiver consists of the intentional abandonment or voluntary relinquishment of a known right." *Statewide Grievance Committee* v. *Brown*, 67 Conn. App. 183, 188, 786 A.2d 1140 (2001), cert. denied, 259 Conn. 919, 791 A.2d 568 (2002). It "involves the idea of assent, and assent is an act of understanding. . . . Intention to relinquish must appear, but acts and conduct [consistent] with intention to [relinquish] . . . are sufficient." (Internal quotation marks omitted.) Id. "Whether a waiver has occurred is a factual question, reviewable under the clearly erroneous standard." *Ridgefield* v. *Eppoliti Realty Co.*, 71 Conn. App. 321, 340, 801 A.2d 902, cert. denied, 261 Conn. 933, 806 A.2d 1070 (2002).

Similarly, the question of what Weinstein intended through his conduct and statements prior to and at the June 18, 1999 hearing also is a factual one, subject to the same standard of review. See id.

The court, after considering the transcript of the June 18, 1999 hearing and the surrounding circumstances, addressed and rejected the claim now pressed by the defendants. It noted that in the period leading to the hearing, Weinstein had actively resisted the execution by filing several motions as well as this action. The court noted further that in response, the defendants insisted on freezing the full $375,000 subject to the execution until the declaratory judgment action was resolved, and, to ensure that the execution would remain in place, filed an appeal from Judge Koletsky's order releasing the funds and a motion for an appellate stay in the event one did not apply automatically.

The court characterized the situation at the time of the June 18, 1999 hearing as a "serious dilemma" for Weinstein, insofar as he faced the possibility of a lengthy appeal or a costly interpleader action or both that would "keep the money in limbo." It found that Weinstein, in agreeing to the escrow arrangement, was not so much freely assenting as making the best deal he could under the circumstances. According to the court, what Weinstein "would not give up—and he made this very clear—was his right to seek damages from the defendants and their client for the losses they had caused to [the plaintiff] by serving and continuing to insist on the enforcement of the execution or its equivalent. Thus, the escrow arrangement was entered into, with attorney Weinstein expressly preserving his client's right to seek damages from the defendants and their client for abuse of process."

In conclusion, the court observed that limiting the lost interest award to the period preceding establishment of the escrow account would run counter to the

policy against overexecution because "one particularly improper use of an excessive execution is to force the party against whose assets it is directed to reach a hasty, potentially disadvantageous settlement of litigation in order to rid himself of the burden of the excessive execution. Logically, if that is the sort of harm to be avoided by forbidding excessive executions, it would be unfair and absurd to treat losses suffered by one who capitulates to such pressure to avoid more costly consequences as noncompensable, self-inflicted wounds."

After our review of the entire record, we conclude that the court's findings pertaining to Weinstein's intent and lack of waiver find support in the evidence and, therefore, are not clearly erroneous. During the June 8, 1999 hearing, Weinstein, in agreeing that the funds could be held in escrow but still subject to an execution intended to preserve National's priority, explicitly reserved his right to seek damages. The defendants' attempt to characterize Weinstein's remarks as, in actuality, a relinquishment of the right to seek *future* damages is unpersuasive.[22] To accept the defendants'

---

[22] At the hearing, the defendants suggested leaving the execution in place, even though the funds would be escrowed with the bank's counsel, as an attempt to preserve National's priority over other potential creditors of the plaintiff. In reply, Weinstein stated the following: "To the extent that [National] seeks to utilize the execution, which I believe was wrongfully applied for in the first place, just so it's clear, that that's without any prejudice that my client has to seek damages in connection with even a new execution or reservice of that execution. If the money is being held in lieu of the execution, which is the way I really understand these proceedings, I think [National] is safe.

"But if they are concerned about any other issues, I'm not going to waive my client's rights with their running around with an execution, which I don't think they were entitled to in the first place." In subsequently withdrawing his motion for contempt, Weinstein stated that "we are withdrawing it without prejudice as to any damages that may have ensued or any claims as a result of the actions that led to the motion for contempt." The defendants' argument that these statements somehow amounted to a waiver of the plaintiff's right to seek future damages is, to be frank, incoherent.

version of events, which is based on their interpretation of isolated statements from the June 18, 1999 hearing and which ignores the circumstances surrounding that hearing, as referenced by the court, would do violence to the deferential standard of review applicable to determinations of waiver. Accordingly, this claim fails.

2

The defendants additionally challenge as improper the rate used by the court in calculating lost interest due to the plaintiff. We conclude that the court acted within its discretion in awarding lost interest at 8 percent.

The lost interest awarded by the court is analogous to an award of prejudgment interest. Connecticut's case law has established that such "interest is to be awarded if, in the discretion of the trier of fact, equitable considerations deem that it is warranted. . . . If interest is due, it is an element of damages." (Citations omitted.) *Paulus* v. *LaSala*, 56 Conn. App. 139, 147, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000). "Whether to include interest as damages is an equitable determination for the trial court and interest may be awarded at the statutory rate from the time the money becomes due." *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 2 Conn. App. 322, 329, 479 A.2d 249 (1984), rev'd in part on other grounds, 199 Conn. 683, 508 A.2d 438 (1986). "In determining whether the trial court has abused its discretion [in awarding interest], we must make every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *Memberworks, Inc.*, 273 Conn. 634, 666, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.*, 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005).

"Prejudgment interest in accordance with § 37-3a normally is awarded for money wrongfully withheld . . . ." *Ceci Bros., Inc.* v. *Five Twenty-One Corp.*, 81 Conn. App. 419, 427, 840 A.2d 578, cert. denied, 268 Conn. 922, 846 A.2d 881 (2004). That section provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ." General Statutes § 37-3a (a). The court agreed with the plaintiff that the statutory rate was applicable, but reduced it by the average rate of interest earned on the wrongfully withheld funds while they were held in escrow by the bank's attorney. The court, in finding that the funds had earned an average of 2 percent during that time, did not articulate the particular evidence on which it relied.

The defendants' claim as to the rate of interest applied by the court is twofold. They argue first that the plaintiff offered no evidence to show that had it received the withheld funds timely, it would have invested them and earned 10 percent. According to the defendants, certain testimony indicated that the funds, if released, immediately would have been distributed to the plaintiff's partners and creditors. The defendants argue secondarily that there was no evidence showing that the funds, while escrowed during the pendency of the declaratory judgment action, actually earned 2 percent. Rather, they claim, the undisputed evidence indicated that those funds earned interest at some higher rate. The defendants, however, do not identify that rate with any particularity.

The defendants do not provide any authority for the proposition that to be awarded statutory interest, a party first must prove that it actually would have earned that interest absent the wrongful withholding of its money, and we are unaware of any such rule. Rather, "[t]he purpose of General Statutes § 37-3a is to provide

compensation for a delay in obtaining money which rightfully belongs to the plaintiff." *Neiditz* v. *Morton S. Fine & Associates, Inc.*, supra, 2 Conn. App. 331. Toward that end, the General Assembly "may enact such laws with respect to the rate of interest as it deems wise, regulating the rate to be allowed in any case. Such legislation . . . is based on public policy." 47 C.J.S. 85, Interest and Usury § 77 (2005). Inherent in the statute is "the presumption in the business world . . . that the use of money calls for the payment of interest." Id., 176, § 140. Accordingly, we reject that the plaintiff, to be eligible for statutory interest as a component of damages, was required to show that had it received the lender liability settlement funds immediately, it would have retained them, invested them and earned interest at the statutory rate.

The defendants' argument that the plaintiff failed to show that the escrowed funds actually earned 2 percent is equally unavailing. We agree with the plaintiff that when a statute provides for a presumptive rate of allowable interest, it is the *defendants'* burden to establish that some lesser rate ought to apply. See, e.g., *Cole* v. *Bartels*, 4 P.3d 956, 958–59 (Alaska 2000) (party opposing prejudgment interest award bears burden to show that double recovery would result; otherwise prejudgment interest awarded as matter of course); *Simpson* v. *Hanover Ins. Co.*, 588 A.2d 1183, 1185 (Me. 1991) (prevailing party presumptively entitled to award of prejudgment interest; burden on opposing party to show good cause for full or partial waiver). In any event, our review of the record convinces us that the court's finding that the escrowed funds earned an average rate of 2 percent had an adequate basis in the evidence.[23]

---

[23] Specifically, James G. Sutton, the president of the plaintiff's general partner, testified that the escrow account bore 2 percent interest. Additionally, a bank statement issued at the outset of the escrow period indicated that the funds were earning 2 percent. Although the defendants direct us to undisputed evidence showing the total amount of interest earned over the entire escrow period, from which they imply that the court should

Pursuant to the foregoing analysis, we conclude that the court did not abuse its discretion in awarding interest at 8 percent. We turn now to the claims raised by the plaintiff.

## II

## THE CROSS APPEAL

In its cross appeal, the plaintiff also contests the amount of damages awarded by the court. Specifically, it claims that the court improperly (1) calculated damages on the basis of a wrongful execution of $150,000, rather than $175,000, of the lender liability settlement proceeds, (2) made a mathematical error in calculating damages, (3) failed to award business continuation expenses attributable to its general partner, Suffield Development Corporation, and (4) failed to award punitive damages. We address these claims in turn.

## A

The plaintiff's first claim is that it was wrongfully deprived of $175,000 as a result of the defendants' execution and, therefore, the court improperly based its calculation of damages on a wrongful deprivation of only $150,000. It argues that Judge Koletsky, in deciding the declaratory judgment action, determined that the

have imputed the applicable rate, we are not persuaded. The resolution of conflicting evidence is a matter for the trial court. *Lisiewski* v. *Seidel*, 95 Conn. App. 696, 706, 899 A.2d 59 (2006). Moreover, the figure cited by the defendants represents the interest earned on the entire $375,000 held in escrow. The defendants failed to present any calculations that would have established what portion of that interest, which presumably accrued on a compound basis and at a fluctuating rate, was attributable to the wrongfully withheld $150,000. See *Commissioner of Transportation* v. *Larobina*, 92 Conn. App. 15, 32, 882 A.2d 1265 ("[w]hen faced with the constraints of incomplete information, a court cannot be faulted for fashioning an award as equitably as possible under the circumstances"), cert. denied, 276 Conn. 931, 889 A. 2d 816 (2005).

plaintiff was deprived of $175,000.[24] According to the plaintiff, when the court in the present action found instead that it had been deprived of $150,000, it "rewr[ote] history and effectively denie[d] the existence of a fact that cannot be disputed." We disagree with the plaintiff.

In determining the amount by which the defendants had overexecuted, Judge Sheldon revisited the question of how much of the lender liability settlement funds National was entitled to recover pursuant to the stipulation in the foreclosure action. Although Judge Koletsky, in the declaratory judgment action, had found that the sliding scale parameters in paragraph three represented net amounts, Judge Sheldon found instead that they represented gross amounts. Accordingly, Judge Sheldon found that National was entitled to recover $225,000 under the stipulation, rather than the $200,000 found by Judge Koletsky. Consequently, Judge Sheldon concluded that the defendants' $375,000 execution was excessive to the extent of $150,000, rather than the $175,000 that would have followed had he adopted Judge Koletsky's interpretation of the stipulation. Judge Sheldon did not consider the defendants to be bound by Judge Koletsky's prior interpretation of the stipulation because they were not parties to the declaratory judgment action, and he concluded that "the question [of how much National was owed pursuant to the stipulation] remains open for this court to decide in this action as between [the defendants] and [the plaintiff]."

The plaintiff's claim sounds in preclusion, in particular, collateral estoppel. "Whether the court properly

[24] We reject at the outset the plaintiff's further assertion that Judge Koletsky's determination as to the amount of the wrongful deprivation was affirmed on appeal. Rather, as previously stated and as the reported decision in the appeal from the declaratory judgment action makes clear, this court declined to review that finding on its merits due to an inadequate record. See *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 60 Conn. App. 848–52.

applied the doctrine of collateral estoppel is a question of law for which our review is plenary." (Internal quotation marks omitted.) *LaBow* v. *Rubin*, 95 Conn. App. 454, 461, 897 A.2d 136 (2006). "Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated *between the same parties in any future lawsuit.*" (Emphasis added; internal quotation marks omitted.) *Corcoran* v. *Dept. of Social Services*, 271 Conn. 679, 709, 859 A.2d 533 (2004); see also 1 Restatement (Second), Judgments § 27, comment (a) (1982) ("rule of issue preclusion is operative where *the second action is between the same persons who were parties to the prior action*" [emphasis added]); 1 Restatement (Second), supra, § 34 (3) ("person who is not a party to an action is not bound by . . . the rules of res judicata").

In the declaratory judgment action, the only parties were the plaintiff and National. The defendants in this action acted as National's counsel, but were not parties themselves.[25] Accordingly, the court concluded correctly that it was not bound by Judge Koletsky's findings in the declaratory judgment action.

B

The plaintiff argues next that even if the court properly based its lost interest calculation on a wrongful deprivation of $150,000, it made a mathematical error in calculating such lost interest. The defendants concede that the court made a calculational error and we agree.

In calculating lost interest at 8 percent, the court first determined that interest accumulates at that rate on a

---

[25] The plaintiff does not argue that the defendants were in privity with National or that they should be bound by the outcome of the declaratory judgment action because they controlled National's participation therein. See 1 Restatement (Second), supra, § 39.

principal amount of $150,000 at $32.877 per day. Multiplying that figure by 581 days, the court arrived at a total lost interest award of $18,453. As the plaintiff correctly points out, however, 581 times $32.877, rounded to the nearest dollar, is $19,102. Accordingly, the court's damages award must be increased by $649, the difference between $19,102 and $18,453.

### C

The plaintiff's next challenge to the court's damages award is that it improperly failed to include compensation for the business continuation expenses of the plaintiff's general partner, Suffield Development Corporation. We disagree with this claim.

The following additional facts are pertinent. The plaintiff sought, as a component of damages, reimbursement of certain business expenses of both itself and of its general partner, the corporation, which purportedly were incurred so that the plaintiff could remain a viable entity pending resolution of the present action. Those expenses included amounts paid for biennial reports filed with the secretary of the state, state taxes and accounting fees for the preparation of tax returns. The court awarded reimbursement of a portion[26] of the expenses attributable to the plaintiff's business, but not for those incurred by the corporation. It concluded that the corporation's expenses were "not compensable in this lawsuit for the simple reason that [the corporation] is a separate legal entity [from the plaintiff], which is not a party to this action. . . . In fact, for that reason,

[26] Although the plaintiff sought reimbursement of expenses incurred from 1999 forward, the court disallowed those predating November 28, 2000, the date on which this court affirmed the trial court's judgment in the declaratory judgment action. The court reasoned that that action, which was initiated by the plaintiff, would have required the plaintiff to prolong its existence as a business entity regardless of the initiation of the present action.

all expenses claimed by the plaintiff on behalf of [the corporation] must be rejected."[27]

The plaintiff claims that the court improperly failed to award damages attributable to the corporation's continued existence. It argues in particular that General Statutes § 34-335 (c) requires that it reimburse the corporation for its business expenses and, therefore, they were a proper element of damages even though the corporation was not a party to this action. We are not convinced.

Whether § 34-335 (c) contemplates mandatory reimbursement by the plaintiff of the business expenses of its corporate general partner is a question of statutory interpretation. "Statutory construction is a question of law and therefore our review is plenary." (Internal quotation marks omitted.) *State* v. *Hardy,* 278 Conn. 113, 119, 896 A.2d 755 (2006).

"When interpreting a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z." (Citation omitted; internal quotation marks omitted.) *D'Angelo Development & Construction Co.* v. *Cordovano,* 278 Conn. 237, 243, 897 A.2d 81 (2006).

Section 34-335 governs the rights and duties of a partner in a limited liability partnership such as the

[27] The court declined to award reimbursement for post-2000 accounting services because the invoices submitted failed to differentiate between services provided to the plaintiff and to the corporation and, further, it found the fees charged to be excessive.

plaintiff. Subsection (c) provides that "*[a] partnership shall reimburse a partner for payments made* and indemnify a partner for liabilities incurred by the partner *in the ordinary course of the business of the partnership* or for the preservation of *its business or property.*" (Emphasis added.) General Statutes § 34-335 (c). Clearly, this provision allows for reimbursement of expenses attributable to the operations of the plaintiff partnership itself. The plaintiff provides no legal authority in support of its assertion that the corporation's *own* taxes, accounting fees and annual report expenses were incurred in the ordinary course of *the plaintiff's* business, and we reject that interpretation as contrary to the plain language of the statute and basic partnership law. See General Statutes § 34-313 ("partnership is an entity distinct from its partners"); cf. *Spector* v. *Konover*, 57 Conn. App. 121, 131–32, 747 A.2d 39 (absent explicit agreement, partner of shopping center entitled to reimbursement only for expenses incurred to manage shopping center, not for those incurred in connection with partner's other entities), cert. denied, 254 Conn. 913, 759 A.2d 507 (2000). Accordingly, we conclude that the court properly disallowed the business expenses of the corporation as an element of damages.

## D

The plaintiff's last claim is that the court improperly failed to award punitive damages because the defendants' conduct, contrary to the court's findings, was malicious. We disagree.

The following additional facts are relevant. The court, in declining to award the plaintiff punitive damages, reasoned that Oliver, in obtaining the execution, was acting within what he believed, albeit wrongly and baselessly, to be pressing time constraints and under incomplete information, but with the aim of protecting his client's interests. It concluded that his "purpose for

pursuing the execution was not extortionate or malicious." In particular, Oliver "did not seek to force [the plaintiff] to pay National money it did not truly owe, nor did he attempt to persuade it to abandon or reach a prompt, potentially disadvantageous settlement of contested legal issue to avoid the burden of an excessive execution."

Punitive damages are "a remedy awarded only when the evidence shows reckless, intentional or wanton violation of the rights of others. . . . The trial court's findings regarding the alleged reckless indifference or malicious intent of the [defendants] are factual findings subject to review under the clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *Everett* v. *Pabilonia*, 11 Conn. App. 171, 178, 526 A.2d 543 (1987). Recklessness is more than negligence, gross negligence or a failure to take reasonable precautions to avoid injury to others. *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 137–38, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003). "It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Internal quotation marks omitted.) Id., 138.

The plaintiff, quoting from a case involving a claim of vexatious litigation, notes that our Supreme Court has explained that a party is said to have acted with malice if it has acted "primarily for an improper purpose . . . ." *DeLaurentis* v. *New Haven*, 220 Conn. 225, 256 n.16, 597 A.2d 807 (1991). According to the plaintiff, because "acting primarily for an improper purpose is the gravamen of an action for abuse of process . . . and [because] the trial court expressly found that, notwithstanding their lack of an extortionate purpose, the defendants nonetheless *did* act primarily for an improper purpose . . . the trial court's findings compel the conclusion that the defendants acted with malice

here." (Citation omitted; emphasis in original.) We are not convinced.

In the case cited by the plaintiff, the court explicitly prefaced the quoted definition of malice with the qualifier, "[i]n a vexatious suit action . . . ." *DeLaurentis* v. *New Haven*, supra, 220 Conn. 256 n.16. Logically, if we were to accept the plaintiff's argument that that standard should be removed from its context and imported wholesale into abuse of process jurisprudence, a finding of malice necessarily would follow every time a court determines that abuse of process has occurred because abuse of process is, by definition, "the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed . . . ." (Emphasis in original; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, supra, 260 Conn. 772. Our review of the case law governing abuse of process discloses, however, that not all instances of abuse of process are accompanied by findings of malice and, consequently, punitive damages awards. For example, in *McGann* v. *Allen*, 105 Conn. 177, 134 A. 810 (1926), our Supreme Court explained that only consequential damages should be awarded for "abuse of legal process *not malicious*" whereas "[i]f, *in addition*, [a jury finds] the abuse of process was accompanied with malice [it may add] a sum as exemplary damages . . . ." (Emphasis added.) Id., 184–85. The plaintiff's reasoning, therefore, is contrary to long established law and must be rejected.

The plaintiff argues additionally that the court improperly failed to conclude that the defendants' conduct, though not extortionate, still amounted to a reckless indifference to, or a wanton violation of, the plaintiff's rights. We decline, however, to revisit the court's factual finding in this regard because its determination that Oliver's aim in pursuing the execution was

to protect his client's ability to collect what it was owed under the stipulation finds adequate support in the testimonial record. Moreover, we are influenced by our Supreme Court's admonition that, in abuse of process cases against attorneys, care should be taken to avoid creating rules that would "have a chilling and inhibitory effect" on the litigation process; (internal quotation marks omitted) *Mozzochi* v. *Beck*, 204 Conn. 490, 495, 529 A.2d 171 (1987); and, consequently, the zealous representation of clients. We conclude that the court's failure to find malice and to award punitive damages was not clearly erroneous.

On the defendants' appeal, the judgment is affirmed. On the plaintiff's cross appeal, the judgment is reversed only as to the amount of lost interest due the plaintiff and the case is remanded with direction to render judgment increasing the amount awarded by $649.

In this opinion the other judges concurred.